**GO-VIDEO, INC., Plaintiff-Appellee,**

v.

**AKAI ELECTRIC COMPANY, LTD., et al., Defendants,**

**and**

**Matsushita Electric Industrial Company, Ltd., Defendants-Appellants.**

No. 88-2900.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 2, 1988.

Decided Sept. 5, 1989.

Paul F. Eckstein, Brown & Bain, P.A., Phoenix, Ariz., A. Paul Victor, Weil, Gotshal & Manges, New York City, Philip C. Gerard, O'Connor, Cavanagh, Anderson, et al., Phoenix, Ariz., Anthony Liebig, Liebig & Kulzick, Los Angeles, Cal., Mark I. Harrison, Harrison, Harper, Christian & Dichter, P.C., Phoenix, Ariz., and Lance Gotthoffer, Marks, Murase and White, Phoenix, Ariz., for the defendants-appellants.

Daniel R. Shulman, Gray, Plant, Mooty, et al., Minneapolis, Minn., Joseph M. Alioto, Alioto & Alioto, San Francisco, Cal., and R. Terren Dunlap, Scottsdale, Ariz., for the plaintiff-appellee.

Before SCHROEDER, REINHARDT and LEAVY, Circuit Judges.

REINHARDT, Circuit Judge:

This is an interlocutory appeal from an order of the District Court for the District of Arizona in which we must decide two related questions: first, whether an antitrust plaintiff who serves process pursuant to the provisions of § 12 of the Clayton Act, 15 U.S.C. § 22, may properly establish venue under the Alien Venue Act, 28 U.S.C. § 1391(d); and second, whether it

was error for the district court to exercise personal jurisdiction over alien defendants based on an assessment of their contacts with the United States as a whole, rather than their contacts with the forum district. The district court ruled that venue need not be established under the same statute which provides the basis for service of process, that venue lay properly in Arizona under the Alien Venue Act, and that the "national contacts" of the defendants were sufficient for the exercise of personal jurisdiction. We agree and affirm.

I.

The plaintiff in the underlying action, Go–Video, Inc. ("Go–Video"), is a Delaware corporation with its principal place of business in Arizona. Since 1984, Go–Video has apparently been attempting to purchase parts from which it could assemble a "dual deck" video cassette recorder, the "VCR–2," for which it holds a United States patent.[1] In its complaint Go–Video alleges that a number of foreign manufacturers of consumer electronics, a Japanese electronics trade association (collectively known as the "manufacturing defendants"), various domestic motion picture companies, and a motion picture trade association (the "motion picture defendants") conspired to prevent the marketing of dual deck VCR's in the United States and, pursuant to this allegedly illicit agreement, refused to deal with Go–Video. These actions, Go–Video claims, violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

Go–Video served process on the manufacturing defendants through the long-arm provision of Section 12 of the Clayton Act, 15 U.S.C. § 22, which provides:

Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also

---

1. "Dual deck" VCR's, which enable the user to copy videocassettes without the use of a second machine, are thought to raise the possibility of video "pirating" or "bootlegging" and have consequently been the source of some controversy among consumers, potential manufacturers and those who hold copyrights of material distributed on videocassette. Possibly as a result of this controversy, dual deck machines—manufactured under any patent—are not yet generally available in the United States. *See generally,* Fisher, Reconstructing the Fair Use Doctrine, 101 Harv.L.Rev. 1661, 1665–66, 1669–72 (1988); Comment, The Home Use Videotaping Controversy: Fair Use or Fair Game?, 49 Brooklyn L.Rev. 363, 394–98 (1983).

in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

As each of the manufacturing defendants was an alien corporation, Go–Video filed suit in the United States District Court for the District of Arizona, alleging venue to be proper under the terms of the Alien Venue Act, codified at 28 U.S.C. § 1391(d):

Venue generally

. . . . .

(d) An alien may be sued in any district.

The appellants here are the remaining manufacturing defendants, four Japanese and one Korean corporation.[2] After being served by Go–Video, some of the manufacturing defendants filed motions to dismiss Go–Video's complaint for lack of personal jurisdiction and improper venue, under Fed.R.Civ.P. 12(b)(2) and (3). All parties eventually filed a "Joint Application for Determination of 'National Contacts' Issue of Law," asking the district court to rule definitively on the personal jurisdiction question. The district court ruled in favor of Go–Video, determining venue to be proper in Arizona and the use of "national contacts" analysis consistent with the approach sanctioned by this court in *Securities Investor Protection Corp. v. Vigman,* 764 F.2d 1309 (9th Cir.1985) ("*Vigman*"). The manufacturing defendants petitioned for certification of the questions raised in the Joint Application under the interlocutory appeal provision of 28 U.S.C. § 1292(b).[3] The district court granted the certification request and we agreed to hear

the interlocutory appeal. 28 U.S.C. 1292(b); Fed.R.App.P. 5.[4]

## II.

■ We turn first to appellants' argument that section 12 of the Clayton Act must be read as an "integrated whole," requiring every antitrust plaintiff to satisfy the section's venue provision if it is to avail itself of its worldwide service of process authorization.[5] They base this argument on the language that introduces section 12's service of process provision, contending that the reference to serving process "in such cases" refers to cases under which the venue requirements of the section have already been satisfied. Go–Video argues in response that "such cases" are the cases encompassed by the first line of section 12, namely "[a]ny suit, action, or proceeding under the antitrust laws against a corporation." While the answer is certainly not apparent merely from an examination of the face of the statute, three factors support the conclusion that the latter construction is the proper one: it is more closely in keeping with the manner in which courts have traditionally defined the relationship between one statute's specific venue provision and the general federal venue statutes; it is more consistent with the legislative history and overall purpose of the Clayton Act; and it is better supported by precedent. We discuss each of these factors in turn.

### A. Venue Statutes and the Antitrust Laws

Appellants' construction of Clayton Act § 12 is at least partially premised on the

---

**2.** There were originally twenty-three manufacturing defendants; by the time of this appeal, seven remained. During the pendency of the appeal, two of the seven were dismissed from the underlying actions and, by consent of the parties, were dismissed from the appeal as well. The remaining defendants are: Matsushita Electric Industrial Co., Ltd.; Samsung Electronics Co., Ltd.; Sanyo Electric Co., Ltd.; Sharp Corporation and Victor Company of Japan, Ltd.

**3.** In the interest of simplicity, we shall refer to the manufacturing defendants collectively as "appellants" when discussing the arguments they advance in this appeal.

**4.** Both questions we answer here are legal ones, reviewable de novo by this court. *See Pacific Atlantic Trading Co. v. M/V Main Express,* 758 F.2d 1325, 1326–27 (9th Cir.1985).

**5.** We note that this is the specific question left open by this court in *O.S.C. Corporation v. Toshiba America, Inc.,* 491 F.2d 1064, 1068 (9th Cir.1974), a case in which a jurisdictional defect made consideration of venue questions unnecessary. *See also Chrysler Corp. v. Fedders Corp.,* 643 F.2d 1229, 1237 n. 3 (6th Cir.1981) (declining to address relationship of section 12 and section 1391(d) given defendant's waiver of objections to venue and service of process in the district court).

notion that the enactment of its specific venue provision overrides the federal venue laws of general application. Leaving for Section B, *infra*, consideration of the question whether there is something unique in the language, structure, or legislative history of section 12 which justifies appellants' theory, we note that, as a general matter, courts have interpreted special venue provisions to supplement, rather than preempt, general venue statutes. *See* 15 Wright & Miller, *Federal Practice and Procedure*, § 3818 at 108–109 (1976) ("Wright & Miller") ("Supreme Court has held that special venue statutes are supplemented by, and are to be read in light of, liberalizing provisions of the general venue statutes") (citing *Pure Oil v. Suarez*, 384 U.S. 202, 86 S.Ct. 1394, 16 L.Ed.2d 474 (1966)).

In *Pure Oil*, the Court ruled that venue for a seaman's Jones Act [46 U.S.C. App. § 688] claim was proper under a general venue statute, 28 U.S.C. § 1391(c), under which the defendant corporation could be sued in any district in which it transacted business, even though the Jones Act had its own venue provision, under which venue would have been proper only where the defendant resided or had its *principal* place of business. 384 U.S. at 207, 86 S.Ct. at 1397. The Court reasoned that the general venue statute was appropriate since it was "basically consistent with the purposes and language" of the Jones Act and ruled that it would hold a general venue provision inapplicable only if there was evidence that Congress intended the specific venue provision to be exclusive or intended venue to be restrictively applied under the statute at issue. 384 U.S. at 205–07, 86 S.Ct. at 1396–97. In reaching this result, the *Pure Oil* court was squarely within the dominant modern view that venue statutes are given liberal, rather than restrictive, interpretations unless specific evidence militates in favor of a contrary reading. *See* 4 Singer, *Sutherland Stat. Const.*, § 67.04 at 357 (4th ed.1986).

Cases dealing with claims under the antitrust laws have likewise taken the view that the general federal venue statutes coexist (although not necessarily coextensively) with the specific venue provisions contained in the various antitrust laws. Usually beginning with the long-settled proposition that venue questions in the antitrust realm are peculiarly fact-specific ones, *see, e.g., United States v. Aluminum Co. of America*, 20 F.Supp. 13, 16 (S.D.N.Y.1937), such cases have examined whether the facts a plaintiff has pleaded satisfy *either* a general, or a specific antitrust, venue statute. *Delong Equipment Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843, 855 (11th Cir.1988) ("In a federal antitrust case, venue may be established under § 4 of the Clayton Act, 15 U.S.C. § 15, § 12 of the Clayton Act, 15 U.S.C. § 22, or the general federal venue statute, 28 U.S.C. § 1391(b).") (footnote omitted); *Ballard v. Blue Shield of Southern W.Va., Inc.*, 543 F.2d 1075, 1080 (4th Cir.1976) (15 U.S.C. §§ 15, 22 "are not exclusive" for venue; venue can also be satisfied under 28 U.S.C. § 1392(a)).

Although the Alien Venue Act was enacted separately from the rest of section 1391, its relationship to specific venue statutes is not materially different than that of the provisions already mentioned. *See* 1A *Moore's Federal Practice*, ¶ 0.342[6] at 4170–71 (section 1391(d) "is a provision of general applicability[,] whether venue is governed by the general venue statute or by a special venue provision"). Indeed, if the relationship between the alien venue provision and specific venue statutes departs at all from that of specific venue statutes and the rest of section 1391, it does so in the direction of more *expansive* application of § 1391(d). In *Brunette Machine Works, Ltd. v. Kockum Industries, Inc.*, 406 U.S. 706, 92 S.Ct. 1936, 32 L.Ed.2d 428 (1972), the Supreme Court held that a specific venue provision concerning actions for patent infringement did not bar a suit under which venue had been satisfied under § 1391(d), even though the Court had previously held that the same patent venue statute did preclude the satisfaction of venue under the general corporate venue provision of § 1391(c). 406 U.S. at 713–14, 92 S.Ct. at 1940–41 (distinguishing *Fourco Glass Co. v. Transmirra Products Corp.*, 353 U.S. 222, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957)). The *Brunette* court interpreted

§ 1391(d) to state "a principle of broad and overriding application" which prevented an alien defendant from using a narrower venue provision in another statute as a "shield against suit." *Brunette*, 406 U.S. at 714, 92 S.Ct. at 1941. In light of this entire discussion, it should be clear that—in order for appellants' position to be accurate—there must be something either in Clayton Act § 12, or merely in the act of serving process pursuant to that section, which renders its venue provision exclusive and precludes the application of any other federal venue statute.

### B. The History and Interpretation of the Clayton Act

We turn, then, to an assessment of the history and interpretation of the Clayton Act, specifically of section 12, in order to determine whether there exists any evidence of a Congressional intention to have the venue and service of process provisions operate as the "integrated [and more restrictive] whole" which appellants envision. With respect to the legislative history of the Act, the manner in which Congress believed the provisions would interact is (as is so often the case) not apparent. While it is clear that the legislative history provides no affirmative support for appellants' position, it is difficult to say with any assurance that the history guides us to any conclusion as to how Congress "intended" the two provisions to coexist, or even considered the manner in which they would.

At the same time, the Congressional treatment of what ultimately became section 12 is somewhat enlightening. To the extent it demonstrates anything, it reveals that Congress viewed the questions of venue and service of process separately, with the latter issue of subsidiary importance. The version of section 12 initially introduced in the House contained only a venue provision, essentially allowing a suit against a corporation to be brought anywhere the corporation may be found. Most of the debate centered around the question of where one would expect to be allowed to bring suit for antitrust violations. When, in the context of these debates, Representative Webb of North Carolina objected to a proposed amendment on the ground that

service of process might not be possible in some places in which venue would lie, he was rebuffed by Rep. Sumners of Texas, who explained that service of process could be dealt with later, if necessary, in "subsequent legislation." The discussion ended there; the particular amendment at issue was defeated, and the House sent a bill to conference that contained a venue provision very close to that of current section 12, with no mention of service of process whatever. 51 Cong.Rec. 9607–09, 63d Cong., 2d Sess. (July 1, 1914), *reprinted in* 2 Kintner, *Legislative History of the Federal Antitrust Laws and Related Statutes,* 1651–54 (1978).

It was the Senate, in its consideration of the bill that became the Clayton Act, that added the service of process provision. The provision apparently was added without debate or objection, with no indication that it was intended to relate, let alone be subject, to the section's venue provision. *See* 51 Cong.Rec. 14324, 63d Cong., 2d Sess. (Aug. 27, 1914), *reprinted in* 3 Kintner, *supra,* at 2161. From this sparse history, we certainly cannot conclude that Congress affirmatively *intended* that section 12's service of process provision would be limited by the venue provision which, apparently as a matter of happenstance or convenience, preceded it in the text of the legislation ultimately enacted.

We note briefly that the general interpretation which courts have given section 12 also runs contrary to the construction for which appellants argue. In fact, courts have viewed the section's main contribution to be its expansion of the bounds of venue. *See, e.g., United States v. Scophony Corp.,* 333 U.S. 795, 806–08, 68 S.Ct. 855, 861–62, 92 L.Ed. 1091 (1948) (Section 12 substituted broad, practically-founded venue tests for the older, "hair-splitting legal technicalities" of the Sherman Act). *See also* 15 Wright & Miller at 109–110 (venue provisions of Clayton Act were "clearly broadening in [their] effect"). In light of this authority and comment, we would be even more reluctant to adopt a construction of section 12 which would, by limiting the availability of the valued tool of worldwide service of process, recast its venue provi-

sion as a restrictive, rather than a broadening, provision and might prevent plaintiffs from pursuing legitimate claims under the antitrust laws.

### C. Cases and Comment on the Question

In light of the preceding discussion, it is somewhat surprising that there is a division among the lower federal courts that have considered the specific question we address here. Several courts have held, and at least one commentator has suggested, that the use of the "such cases" language in section 12's service of process provision acts to limit its reach to cases in which the venue provision it follows in the text has been satisfied. Other cases, and other commentators, have suggested the contrary view and have held that the provisions are independent, with "such cases" referring to antitrust cases generally. As we have already stated, we adopt the latter construction; we discuss below the conflicting cases and comment.

The case upon which appellants place principal reliance is *Gault v. Foster*, No. 83 C 1688, slip. op. (LEXIS, Genfed lib., Dist. file) (N.D.Ill. Sept. 14, 1984), which held that the world-wide service provisions of the Securities Exchange Act, 15 U.S.C. §§ 77v, 78aa, (provisions modeled on the Clayton Act section at issue in this case, *infra* at 1412–1413) could not be used unless venue was satisfied under the Act as well. Slip op. at 3–4; *see also* Hovenkamp, *Personal Jurisdiction and Venue in Private Antitrust Actions*, 67 Iowa L.Rev. 485, 508–09 (1982) (suggesting that the *Gault* result represents the "better approach" for interpreting the venue and service provisions of section 12). The *Gault* opinion is essentially devoid of analysis, relying primarily on the assertion that "[t]he language [of the sections did] not ... support a reading which would make worldwide service of process dependent on proper venue but then allow that venue to be established under § 1391(b)." Slip op. at 4. Such conclusory assertions have little persuasive force.

A somewhat more convincing argument for appellants' position was recently made by the court in *Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 709 F.Supp. 1279 (S.D.N.Y.1989). In *Michelson*, Judge Lasker ruled that section 12 of the Clayton Act required the construction urged by appellants here. 709 F.Supp. at 1286. In doing so, he rejected the holding of another district court in the Southern District of New York (to be discussed below), relying instead on his sense that his reading of the statute was the one more likely to be adopted by the Second Circuit should it review his holding. 709 F.Supp. at 1287.

Judge Lasker's surmise as to the probable view of the Second Circuit was guided by his interpretation of some of that court's language in *Goldlawr, Inc. v. Heiman*, 288 F.2d 579, 581 (2d Cir.1961) ("the extraterritorial service privilege [of section 12] is given only when the other requirements are satisfied"), *rev'd on other grounds*, 369 U.S. 463, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962). We do not read *Goldlawr* to require such a result. First, the passage just quoted is dictum, unrelated to the actual holdings of the case. Second, and more important, *Goldlawr* was decided before the Supreme Court's decisions in *Pure Oil* and *Brunette*, decisions in which the Supreme Court clarified the relationship between specific statutory venue provisions and the general federal venue statutes, *supra* at 1408–1409, 1409. Particularly in light of the intervening changes in the law, we see no conflict between our holding today and that of the Second Circuit some twenty-eight years ago.

Interestingly, the largest part of Judge Lasker's discussion of the section 12 question in *Michelson* was devoted to his description of Judge Stewart's "strong and persuasive argument" (709 F.Supp. at 1287) in *General Electric Co. v. Bucyrus–Erie Co.*, 550 F.Supp. 1037 (S.D.N.Y.1982). In *Bucyrus–Erie*, the court relied on the *Pure Oil* and *Brunette* analyses to conclude that section 12's service of process provision was available to a plaintiff who established venue under § 1391(d). 550 F.Supp. at 1040–41. The court looked to the *Goldlawr* decision as well, but concluded that its statements were not "conclusive" and that, even if they were, *Goldlawr* did not reach the special case of an alien

corporation. *Id.* at 1041–42; *see Brunette,* 406 U.S. at 713–14, 92 S.Ct. at 1940–41, *supra* at 1409.

We find the *Bucyrus–Erie* decision persuasive and consistent with the balance of the other cases to have looked at issues similar to the one we face today. *See, e.g., Scriptomatic, Inc. v. Agfa–Gevaert, Inc.,* [1973] Trade Cas. (CCH) ¶ 74,594, 1973 WL 830 (S.D.N.Y.1973) (venue proper under 1391(d) where process served under Clayton Act § 12, for "in such cases" language refers to "any suit ... under the antitrust laws"); *Centronics Data Computer Corp. v. Mannesmann,* 432 F.Supp. 659, 661 (D.N.H.1977) (emphasizing peculiar reach of alien venue statute for antitrust action); *Grappone, Inc. v. Subaru of America, Inc.,* 403 F.Supp. 123, 133 (D.N.H.1975) ("special antitrust venue statute is supplemented by general venue statute"); Von Kalinowski, 10 *Antitrust Laws and Trade Regulation,* § 104.03[2] at 104–8 (1988) (citing favorably to cases which hold that "in such cases" refers to antitrust actions generally).[6]

■ In essence, then, appellants' argument reduces to that of the *Gault* court: for some (unstated but nonetheless controlling) reason, the "such cases" described in the final clause of section 12 simply *must* refer to the entire text which immediately precedes it, including the section's venue requirement, rather than to the more general portion of the text referring to antitrust cases as a class. Even if we ignored for the moment that the legislative history (to which we must look to determine the exclusive application of a special venue

statute, *Pure Oil, supra* at 1409) gives no hint that Congress intended the service of process clause to be read in conjunction with, and be limited by, the venue provision, we must reject appellants' argument. When faced with the same argument we face here, the *Bucyrus–Erie* court explained at length the hidden intricacies of the word "such," ultimately concluding that, when used to modify a noun, "such" is always presumed to refer back to that noun as it appeared previously in the text; "such" does not modify other clauses or nouns. In section 12, the court reasoned, "such cases" must therefore be "any suit, action or proceeding under the antitrust laws against a corporation." 550 F.Supp. at 1042 n. 7 (citing *Webster's Third International Dictionary* (unabr. 1963)). Judge Friendly, in examining the same text in a case in the Second Circuit, concluded somewhat more broadly that the "ineptly worded" provision referred only to service of process and had nothing to do with venue. *Leasco Data Processing Equip. Corp. v. Maxwell,* 468 F.2d 1326, 1341 and n. 10 (2d Cir.1972). We do not necessarily endorse either line of analysis, for we think the matter settled by a much less tortured or conclusory approach to statutory construction. Under the canon *reddendo singula singulis,* we interpret a passage in which antecedents and consequents are unclear by reference to the context and purpose of the statute as a whole. *See* 2A *Sutherland Stat. Const.,* § 47.26 at 215–16; *United States v. Simms,* 5 U.S. [1 Cranch] 252, 259, 2 L.Ed. 98 (1803). Looking to the text of section 12, the construc-

---

6. Appellants rely on a series of cases which they claim support the position that service under section 12 can be effected only if venue is proper *under that section.* E.g., *Wood v. Santa Barbara Chamber of Commerce, Inc.,* 507 F.Supp. 1128, 1141 (D.Nev.1980); *Occidental Petroleum Corp. v. Buttes Gas & Oil Co.,* 331 F.Supp. 92, 98 (C.D.Cal.1971). Their reliance is misplaced, for these cases stand merely for the undisputed proposition (of little help to petitioners) that venue must be appropriate under *some* venue statute before process can be effected. *See, e.g., Wood,* 507 F.Supp. at 1141 ("[extraterritorial service pursuant to [section 12] can be valid only if venue is proper in the district where the suit is filed"). Similarly, appellants' claim that a passage in the Supreme Court's opinion in

*Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 372–73, 47 S.Ct. 400, 403, 71 L.Ed. 684 (1927), establishes that serving process under section 12 is proper only when venue is established under section 12 is overstated. As the Supreme Court subsequently explained, the passage in *Eastman* was dictum, discussing a theoretical problem stemming from differences in language in the service of process and venue provisions of section 12 which might have made a difference to the outcome of *Eastman* if the facts had been different than those actually before the Court. *Scophony,* 333 U.S. at 809, 68 S.Ct. at 862. In contrast to appellants' conception of the matter, we do not find such hypothetical speculation to be dispositive authority.

tion of the *Bucyrus–Erie* and *Leasco* courts, the one urged by Go–Video here, is clearly the one more consonant with the purpose of the Clayton Act and better comports with a section designed to expand the reach of the antitrust laws and make it easier for plaintiffs to sue for antitrust violations. *See Scophony,* 333 U.S. at 806–08, 68 S.Ct. at 861–62. Accordingly, we reject the argument that the structure of section 12 itself requires the result which appellants seek.

While appellants' arguments are not facially unreasonable, after our analysis of the relationship of venue statutes generally, the purpose and history of the Clayton Act, particularly section 12, the prior caselaw, and the structure of the section itself, we conclude that process may be served on an antitrust defendant pursuant to 15 U.S.C. § 22 in cases where venue is not established under that section but lies properly under 28 U.S.C. § 1391(d). To borrow from the *Pure Oil* court, allowing the allegedly injured party a greater range of potential places in which to bring suit is without question "basically consistent with the purposes and language" of the Clayton Act. 384 U.S. at 205, 86 S.Ct. at 1396. Indeed, although we need not decide the question, the commentators who suggest that expanding notions of federal venue generally (and, as *Brunette* demonstrates, venue over aliens is fueled by the most expansive of notions of all) have made the venue provisions of section 12 "wholly redundant" may be correct. 15 Wright & Miller, § 3818 at 110. Whatever the case, we find no evidence that Congress intended section 12's venue provisions to be exclusive, or that antitrust venue be narrowly conceived in scope. *See Pure Oil,* 384 U.S. at 206–07, 86 S.Ct. at 1396–97. Barring such evidence, we refuse to nullify general venue laws, even in the face of apparently more narrow venue provisions in specific federal statutes. Appellants' construction of section 12 would allow alien corporations to use a statute which was designed to give injured parties a *greater* ability to sue for antitrust injuries as the instrument which denies plaintiffs a forum in which to sue, or the ability to serve process on those alleged to have injured them.

Venue for Go–Video's suit lies properly in the District of Arizona under 28 U.S.C. § 1391(d).

### III.

■ Having determined that venue lies in Arizona, we now address the related question whether personal jurisdiction could properly be exercised there. To exercise personal jurisdiction over a non-resident defendant in a federal question case, the district court had to determine that a rule or statute potentially confers jurisdiction over the defendant and then conclude that asserting jurisdiction does not offend the principles of Fifth Amendment due process. *See Amba Marketing Systems, Inc. v. Jobar International, Inc.,* 551 F.2d 784, 787 (9th Cir.1977).

■ In this case, the district judge looked first to Clayton Act § 12, a statute which, as has been discussed at length above, authorizes worldwide service of process. *Supra* at 1409, 1410–11; *see also Kramer Motors, Inc. v. British Leyland, Ltd.,* 628 F.2d 1175, 1177 (9th Cir.), *cert. denied,* 449 U.S. 1062, 101 S.Ct. 785, 66 L.Ed.2d 604 (1980). Given the scope of permissible service of process, he concluded that § 12 authorizes the exercise of personal jurisdiction over an alien corporation in any judicial district, so long as the corporation had sufficient minimum contacts with the United States at large, thus obviating the normal requirement that Go–Video demonstrate appellants' ties specific to the forum district. After choosing to apply this "national contacts" method of jurisdictional analysis, the judge considered whether Fifth Amendment considerations of fair play and substantial justice militated against the exercise of jurisdiction over the alien corporations. *See International Shoe Corp. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). He concluded that such considerations were not offended by exercising jurisdiction over appellants and denied their motions to dismiss for want of personal jurisdiction. Appellants challenge both the proposition that the worldwide service of process provision of section 12 confers jurisdiction over an

alien defendant based solely on its national contacts, as well as the district court's conclusion that the constitution is not offended by the exercise of personal jurisdiction based on national contacts analysis. We consider both issues below.[7]

### A. National Contacts and Clayton Act § 12

The district court reasoned that, since process, under § 12, could be served anywhere in the country (indeed anywhere in the world) and since venue, under § 1391(d), was proper in any district, personal jurisdiction for an antitrust suit against an alien corporation could be obtained in any judicial district in the United States. Moreover, given the nationwide service provision of the Clayton Act, the court concluded that, in determining whether it could exercise personal jurisdiction over the alien defendants, it was proper to consider their national contacts.[8] In the latter respect particularly, the court relied principally on our decision in *Vigman, supra,* 764 F.2d 1309 (9th Cir.1985), in which we held national contacts analysis to be appropriate in a suit in which process had been served on an alien corporation pursuant to § 27 of the Securities Exchange Act, 15 U.S.C. § 78aa. 764 F.2d at 1315–16.

In *Vigman,* we reasoned that a federal statute which permits the service of process beyond the boundaries of the forum state broadens the authorized scope of personal jurisdiction. Under such a statute, " 'the question becomes whether the party has sufficient contacts with the United States, not any particular state'." 764 F.2d at 1315 (quoting *Nelson v. Quimby Island Reclamation District,* 491 F.Supp. 1364, 1378 (N.D.Cal.1980)). Accordingly, we held that "so long as a defendant has minimum

contacts with the United States, Section 27 of the [Securities Exchange] Act confers personal jurisdiction over the defendant in any federal district court." *Vigman,* 764 F.2d at 1316.

Appellants argue that *Vigman* does not control this case, inasmuch as it concerned a claim under the Securities Exchange Act, not the Clayton Act. There are two logical flaws in this argument. First, we believe that § 27 of the Securities Exchange Act is a peculiarly apt statute from which to analogize to § 12 of the Clayton Act: the two statutes' service of process provisions are nearly identical; indeed, § 27's provision ("... process may be served in any other district [i.e. districts other than the one in which suit is brought] of which the defendant is an inhabitant or wherever the defendant may be found") was modeled after § 12 ("... process in such cases may be served in the district of which [the defendant] is an inhabitant, or wherever it may be found"). 15 U.S.C. §§ 78aa, 22; *see Leasco,* 468 F.2d at 1341 and n. 10 (Friendly, J.). Second, the reasoning behind the *Vigman* holding is not essentially a function of the particular wording of a statute; rather, it flows from the fact that Congress has authorized service of process nationwide, in fact worldwide. As there is no dispute that § 12 authorizes nationwide service, there is no principled reason not to apply *Vigman* 's reasoning in this case.[9]

*Vigman* hardly stands alone in its adoption of national contacts analysis where Congress has authorized national service. *See, e.g., Fitzsimmons v. Barton,* 589 F.2d 330, 333 n. 4 (7th Cir.1979) ("[s]ervice beyond the bounds of the territorial United States ... raises questions as to the contact of the defendant with the United

---

7. Appellants apparently do not question the district court's conclusion that their contacts with the United States met the basic requirement imposed by *International Shoe* and its progeny—that a defendant maintain at least "minimum contacts" with the relevant forum. We thus assume that appellants' contacts are sufficient for the exercise of jurisdiction, as long as the Nation is the appropriate entity against which to assess them.

8. We note that the Supreme Court has on two occasions explicitly declined to decide the con-

stitutionality of national contacts analysis. *Omni Capital International v. Rudolf Wolff & Co., Ltd.,* 484 U.S. 97, 108 S.Ct. 404, 408 n. 5, 98 L.Ed.2d 415 (1987); *Asahi Metal Industry v. Superior Court,* 480 U.S. 102, 107 S.Ct. 1026, 1033, n. *, 94 L.Ed.2d 92 (1987) (plurality opinion).

9. *Vigman* distinguished *Leroy v. Great Western United Corp.,* 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979), on the ground that in *Leroy* venue was improper. Here, as in *Vigman,* venue is proper. *See* Section II.

States"); *Marsiash v. Morrill,* 496 F.2d 1138, 1142–43 (2d Cir.1974) (service of process under § 27 of Securities Exchange Act requires examination of defendant's contacts with United States); *Steinberg & Lyman v. Takacs,* 690 F.Supp. 263, 265–66 (S.D.N.Y.1988) (same); *Amtrol, Inc. v. Vent–Rite Valve Corp.,* 646 F.Supp. 1168, 1171 (D.Mass.1986) (where jurisdiction authorized by Clayton Act, and process served on alien corporation under § 12, national contacts analysis appropriate); *First Federal Savings & Loan v. Oppenheim, Appel, Dixon & Co.,* 634 F.Supp. 1341, 1345 (S.D.N.Y.1986); *Bucyrus–Erie,* 550 F.Supp. at 1043. *See also* Lilly, *Jurisdiction Over Domestic and Alien Defendants,* 69 Va.L.Rev. 85, 132 (1983) ("federal statutes conferring 'world-wide service of process' also permit a federal court to base its in personam jurisdiction upon the aggregate contacts [with the United States] of an alien defendant"). In light of *Vigman* and these other decisions, we believe that the district judge clearly correct in his view and that the worldwide service provision of § 12 justifies its conclusion that personal jurisdiction may be established in any district, given the existence of sufficient national contacts.

### B. Constitutional Considerations

 Having determined that the district judge correctly concluded that Clayton Act § 12 "potentially confers personal jurisdiction over the [appellants]," *Amba Marketing Systems,* 551 F.2d at 787, we turn to his inquiry into the constitutional aspects of the exercise of personal jurisdiction. Under the due process component of the Fifth Amendment, a court must consider whether the maintenance of the suit (i.e. the exercise of personal jurisdiction over the defendants to the suit) offends traditional notions of fair play and substantial justice. *See Omni Capital,* 108 S.Ct. at 409; *International Shoe,* 326 U.S. at 316, 66 S.Ct. at 158. The district judge, without adding much to his § 12 analysis discussed above, concluded that exercising jurisdiction over appellants based on their contacts with the United States was consistent with due process.

Appellants raise two basic objections to this conclusion, arguing first that the Supreme Court has in dictum rejected the theory which supports the constitutionality of national contacts analysis, and second that the burden of defending the suits in Arizona demonstrates, as a practical matter, the unconstitutional results which follow when national contacts analysis is applied. Neither argument has merit.

Appellants' first contention starts with the following passage from *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982):

> The requirement that a court have personal jurisdiction flows not from Article III, but from the Due Process Clause. The personal jurisdiction requirement recognizes and protects an individual liberty interest. It represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty. Thus, the test for personal jurisdiction requires that "the maintenance of the suit ... not offend 'traditional notions of fair play and substantial justice.' "

456 U.S. at 702–03, 102 S.Ct. at 2104–05 (quoting *International Shoe,* 326 U.S. at 316, 66 S.Ct. at 158) (footnote omitted).

Appellants claim that this language rejects the notion that personal jurisdiction should be assessed by reference to the contacts with the Nation when the federal sovereign has provided for the cause of action. Furthermore, appellants contend, the federal cause of action theory is the only one that supports national contacts analysis. Their argument is fallacious, because it both reads too much into the *Bauxites* dictum and incorrectly describes the analytical basis for the national contacts approach.

Two observations are in order concerning the context of the quotation upon which appellants depend so heavily. First, the Supreme Court in *Bauxites* addressed questions only remotely relevant to those relating to the sufficiency of a defendant's contacts with a given forum; the case concerned the appropriateness of declaring

certain jurisdictional facts admitted, or jurisdictional objections waived, when a party failed to comply with a district court's discovery orders. The quoted passage serves merely to introduce the discussion of the waivability of certain objections to personal jurisdiction. *See* 456 U.S. at 703–05, 102 S.Ct. at 2104–05. Second, the passage's reference to Article III does not rebut a theory (unstated anywhere in the opinion) concerning the relationship of federal sovereignty, federal question cases, and personal jurisdiction. Rather, the reference to Article III draws an explicit contrast to the description, which immediately precedes it in the opinion, of the essence and foundation of subject matter jurisdiction. *See* 456 U.S. at 702, 102 S.Ct. at 2104 ("[s]ubject-matter jurisdiction, then, is an Art. III (sic) as well as a statutory requirement; it functions as a restriction on federal power, and contributes to the characterization of the federal sovereign"). Clearly, a more complete description of the *Bauxites* quotation demonstrates that, when read in context, appellants' passage has little or no relevance to our case. It simply says nothing about the proposition at issue.

On a less structural and more substantive plane, appellants' argument assumes that national contacts analysis is justified only by a particular notion of federal sovereignty in federal question cases. It is true that some courts have endorsed the national contacts approach based on the (not inarguable) proposition that, since the sovereign in federal question cases is the United States, the relevant contacts inquiry necessarily focuses on the Nation as a whole. *See, e.g., FTC v. Jim Walter Corp.*, 651 F.2d 251, 256–57 (5th Cir.1981). Even so, as our decision here demonstrates, national contacts analysis more often finds its basis not in an abstract theory of sovereignty, but in the concrete language of a statute under which Congress has, as it is unquestionably empowered to, authorized nationwide service of process. Indeed, a recent Supreme Court decision implies that a national service provision is a necessary prerequisite for a court even to consider a national contacts approach. *See Omni Capital*, 108 S.Ct. at 409–10 and n. 5 (no

need to address national contacts argument where no provision of statute authorized nationwide service).

Other cases decided since *Bauxites* have reached a conclusion similar to ours with respect to that case's relevance to national contacts issues. *See, e.g., Steinberg & Lyman*, 690 F.Supp. at 265 (rejecting argument that *"Bauxites* has worked a fundamental change in the law of personal jurisdiction" and refusing to depart from the Second Circuit's rule stated in *Mariash, supra* at 1413); *First Federal Savings & Loan*, 634 F.Supp. at 1347 ("the legal landscape of personal jurisdiction/due process analysis does not appear to have been fundamentally affected by *Bauxites"*). We agree with these courts.

In light of our conclusion that there is no Supreme Court precedent to the contrary, we adhere to our decision in *Vigman* that, when a statute authorizes nationwide service of process, national contacts analysis is appropriate. In such cases, "due process demands [a showing of minimum contacts with the United States] with respect to foreign defendants" before a court can assert personal jurisdiction. *Vigman*, 764 F.2d at 1316; *see also Amtrol*, 646 F.Supp. at 1172 (when service effected under Clayton Act § 12, personal jurisdiction depends on the "familiar 'minimum contacts' analysis[;] [h]owever, the relevant forum is not [the state in which suit is brought], but rather the entire United States.")

Appellants' second argument is substantially more simple, and more simply dismissed. They advert to the burden placed on an alien defendant who must litigate in Arizona and conclude that this burden, imposed by virtue of national contacts analysis, is inherently violative of the "fair play and substantial justice" elements of due process. We are not persuaded by appellants' somewhat skeletal argument on this point. As an initial matter, the concerns appellants raise are far more akin to a *forum non conveniens* argument than to a jurisdictional one. Considerations underlying a non-jurisdictional doctrine like *forum non conveniens* must be kept separate from the constitutional and jurisdictional analyses we conduct here. *See Fitzsim-*

*mons*, 589 F.2d at 334 (declining to "import [factors properly suited to *forum non conveniens* analysis] into determination of the constitutionality of exercises of personal jurisdiction"). Second, if there is something peculiarly oppressive about litigating in Arizona, appellants are free to avail themselves of the venue transfer statute (essentially the incorporation of common law *forum non conveniens* doctrine), 28 U.S.C. § 1404(a), and seek to have the case transferred to another jurisdiction. *Id.; see also First Federal Savings & Loan,* 634 F.Supp. at 1347–48. As Go–Video observes, appellants have not done so.

### CONCLUSION

Go–Video was entitled to serve process under 15 U.S.C. § 22, even while seeking to satisfy venue under 28 U.S.C. § 1391(d). Venue, under § 1391(d), was proper in the District of Arizona. In determining whether it could exercise personal jurisdiction over the appellants, the district court appropriately chose to examine the appellants' national contacts, correctly determined that due process was not offended by this decision, and properly ruled jurisdiction to exist.

The judgment of the District Court is AFFIRMED.