In re Gerald D.W. NORTH, Debtor.

Gerald D.W. North, Plaintiff,

v.

Winterthur Assurances, a foreign corporation, Defendant.

Bankruptcy No. 00–05724–ECF–RJH. Adversary No. 01–00874.

United States Bankruptcy Court, D. Arizona.

June 25, 2002.

Gerald D.W. North, Paradise Valley, AZ, pro se.

Ronald J. Ellett, Jay S. Volquardsen, Phoenix, AZ, for debtor.

Brian N. Spector, David B. Earl, James Walker, Phoenix, AZ, for Winterthur.

## OPINION

RANDOLPH J. HAINES, Bankruptcy Judge.

Defendant Winterthur Assurances, a Swiss corporation ("Winterthur"), has moved to set aside a default judgment obtained against it by Plaintiff/Debtor Gerald D.W. North ("North"). For the reasons set forth below, the motion will be granted. Moreover, North's Complaint will be dismissed, without prejudice, for lack of personal jurisdiction over Winterthur.

### Background Facts

The following facts are uncontroverted.

North had been an Arizona attorney for many years but lived for a period of time in London and in Monaco. In 1999, he claimed residency in a hotel in Switzerland and sought to obtain Swiss license plates for his Rolls Royce. Because this required proof of insurance, he obtained a short-term policy (perhaps what we would call a "binder") from Winterthur's office in Crans–Montana, Switzerland. Winterthur sent him a bill at his London address to pay for the policy for the balance of 1999 policy year, and also for the 2000 policy year. North paid the premium for the balance of 1999 policy year, but never paid for the 2000 policy year.

In July 2000 North submitted a hand-written claim to Winterthur's Crans–Montana office claiming that the Rolls Royce had been garaged in London in the late part of 1999 and the early part of 2000, that it had been entrusted to an agent with instructions to try to sell the car, and that both the agent and the car had disappeared. He asserted that he believed his 1999 policy had "garage" coverage for theft, which extended beyond the calendar year, but that he did not know the status of his 2000 policy.

Winterthur responded by fax on July 27, which recited that faxes had been sent to North in October and November 1999 and January 2000 requesting payment for the 2000 policy year, and a fax notice of February 28, 2000 informing North that all coverages had been suspended effective December 31, 1999.

In subsequent discovery, it came to light that in a sale agreement dated March 11, 2000, North claimed to have sold the Rolls Royce to his agent, a Dr. Husam Darwish who had a Jordanian passport. Whether he sold it to Mr. Darwish or merely entrusted it to him for purposes of sale and remission of the proceeds, Winterthur argues that what occurred was an embezzlement rather than a theft, and embezzlement was specifically excluded from the policy coverage.

North filed a adversary complaint in this case on July 11, 2001. The complaint recited that North had obtained the insurance coverage while he "lived in London, England," that the insurance contract provided "garage" coverage for a period extending six months after the insurance policy lapsed or expired, that North had given an agent power of attorney to sell the vehicle on February 24, 2000, and that on or about March 29, 2000 the agent transferred the vehicle's title to his own name and caused it to be shipped to Jordan. The complaint also recited that Winterthur "conducts direct insurance business worldwide and throughout the United States through regionally operated insurance companies. Defendants'[sic] foreign address is: General Guisan–Strasse 40, P.O. Box 300, CH–8401 Winterthur, Switzerland. Defendants' [sic] nearest United States operating location is Winterthur International America, 888 South Figueroa Street, Suite 500, Los Angeles, CA 90017."

A summons was issued to Winterthur on July 18, stating that defendant had 30 days after issuance of the summons to answer. North filed a certificate of mailing stating that on July 18 he had mailed a copy of the summons and complaint by regular U.S. and certified mail upon Winterthur International America in Los Angeles, California, "Attn: President or Managing Agent." North applied for entry of default on September 12, 2001, which was entered by the Clerk on September 14, 2001. North moved for entry of default judgment on October 5, and on October 22 the Court granted default judgment in the amount of $196,935.30.

Winterthur appeared and moved to set aside the default judgment on November 30, 2001.

In affidavits filed in support of its motion, Winterthur established that it owned a subsidiary Winterthur U.S. Holdings Inc., a Delaware corporation. That Delaware corporation owned a subsidiary General Casualty Insurance Company, a Wisconsin corporation. Until late July 2001, just shortly after the complaint and summons were mailed, General Casualty owned Winterthur International America Insurance Company (hereafter "Winterthur America"). Thus the entity to whom the summons and complaint were mailed was a third tier subsidiary of Winterthur. Moreover, the primary offices of Winterthur America, the party served, were located in New York, Dallas and Chicago. It only maintained a small satellite office in Los Angeles where only two or three employees worked.

Winterthur's affidavits further establish that Winterthur and Winterthur America were separate corporations having separate and independent boards of directors and officers. In addition, Winterthur America was engaged only in writing corporate liability policies for international corporations, not automobile policies. Winterthur America did not sell or issue

policies on behalf of Winterthur, act as claims adjuster for Winterthur or as agent for service of process or other notice on behalf of Winterthur.

To explain why he served the third tier subsidiary rather than the company from whom he had obtained the insurance policy in Switzerland, North filed an affidavit stating: "I began to explore the possibility of suing Winterthur in the United States through its 'sister' company or 'branch office.' As an antitrust attorney previously involved in international aspects of antitrust litigation, I was aware that a foreign company can be served in the U.S. if it operates in the U.S. through an agent, sister company, branch office or wholly-owned subsidiary." The only evidence relied upon by North to demonstrate that Winterthur was doing business in the United States through its third tier subsidiary Winterthur America is a website that purportedly says: "Winterthur conducts direct insurance business throughout the U.S. insurance market by way of firmly established regionally operated insurance companies." There is no indication of what corporation authored that website, what kind of insurance business it referred to and whether that included automobile policies, or whether Winterthur America was in fact one of those "regionally operated insurance companies."

**Timeliness of Motion to Set Aside**

■ North argues extensively that Winterthur's motion to set aside the default judgment is untimely. North argues that Winterthur cannot satisfy the first of the three requirements the Ninth Circuit has established for setting aside default judgments: "[1] whether the defendant's culpable conduct led to the default; [2] whether the defendant has a meritorious defense; and [3] whether reopening the default judgment would prejudice the plaintiff." *TCI Group Life Ins. Plan v. Knoebber,* 244

F.3d 691, 696 (9th Cir.2001). North argues that Winterthur's failure to answer the complaint timely "was a conscious and deliberate decision to pursue an alternative course of action in this litigation," and that "it is beyond dispute that Winterthur received the summons and complaint and the default papers because a Winterthur representative signed each of the documents' return receipt of the certified mailing."

These arguments, of course, beg the question—they assume that the employee of the third tier subsidiary was in fact an authorized representative of the Swiss corporation named as defendant.

The reality is that Winterthur moved to set aside the default judgment in less than 60 days after it had been entered. Moreover, its affidavits establish that the third tier American subsidiary does not do business on behalf of the Swiss defendant and does not write automobile insurance policies. It also establishes that the American third tier subsidiary understandably had difficulty identifying who had issued the policy in question. For example, the complaint did not even state that the insurance policy had been purchased in Switzerland. Rather, it stated that plaintiff contracted with defendant insurance company to provide automobile insurance while plaintiff lived in London, England. That allegation is, at best, misleading, if not intentionally so, because the insurance was obtained in order to obtain Swiss plates. Moreover, plaintiff's counsel was, at best, uncooperative when the third tier American subsidiary attempted to find out what the complaint was all about. Finally, there is no explanation of why plaintiff made no attempt to send a copy of the complaint and summons to the office where he had obtained the insurance policy and where he lodged his claim. At oral argument, plaintiff had no justification for this other than to argue that he did not think that would

have been sufficient to establish jurisdiction.

Under the circumstances, particularly the plaintiff's failure to identify the policy as having been issued by a Swiss company and his lack of any effort to provide actual notice to the office where the policy had been purchased and where the claim had originally been made, there is certainly no unreasonable delay in Winterthur's moving to set aside the default in less than 60 days after it had been entered.

### Insufficiency of Service

■ To support the sufficiency of his service, North relied primarily on *Chan v. Soc'y Expeditions, Inc.*, 39 F.3d 1398 (9th Cir.1994), *cert. denied*, 514 U.S. 1004, 115 S.Ct. 1314, 131 L.Ed.2d 196 (1995), for the proposition that service on a foreign corporation can be made on a U.S. subsidiary "if that agent conducts business for the foreign corporation." Plaintiff's Opening Brief at 9.

*Chan* did not hold that it is sufficient merely to have a subsidiary that generates profits from its own line of business, which are then up-streamed as dividends to the foreign parent. That is certainly one plausible meaning of "conducting business for the foreign corporation," and apparently is the meaning on which North relies. In *Chan*, however, the plaintiff argued that the subsidiary was not merely a subsidiary but was in fact the foreign corporation's general agent:

> The Chans distinguish *Shute [v. Carnival Cruise Lines*, 897 F.2d 377, 380 (9th Cir.1990), *rev'd on other grounds*, 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991)] by asserting that Society Expeditions [the American subsidiary that was served] was acting as general agent for [foreign corporate defendant] Discoverer Reederei in the state of Washington. According to the Chans, Discoverer Reederei, which is in the business of operating two ships, including the *World Discoverer*, has no other business than the carriage of passengers, and the passengers were obtained, ticketed and supplied with cabins solely through the efforts of Society Expeditions.

39 F.3d at 1405.

The *Chan* court in turn relied on *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406 (9th Cir.1977), to define what constitutes a "general agent." *Wells Fargo* in turn had relied on a Second Circuit decision in *Gelfand v. Tanner Motor Tours, Ltd.*, 385 F.2d 116, 121 (2d Cir. 1967), *cert. denied*, 390 U.S. 996, 88 S.Ct. 1198, 20 L.Ed.2d 95 (1968), which required that the "representative provides services beyond 'mere solicitation' and these services are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services." The *Wells Fargo* court also noted that "whether the alleged general agent was a subsidiary of the principal or independently owned is irrelevant." 556 F.2d at 423.

Here, however, North relies on nothing more than the fact that Winterthur America was a subsidiary and that Winterthur's website said it "conducts direct insurance business throughout the U.S. insurance market by way of firmly established regionally operated insurance companies." Those facts do not demonstrate that Winterthur America was acting as "general agent" for Winterthur. There is no allegation that Winterthur America sold policies for Winterthur, like the American subsidiary that sold tickets in the foreign-owned cruise ship in *Chan*. In fact, there is not even the barest allegation that Winterthur America does anything for Winterthur. North does not even bother to allege what is the business of Winterthur America. It

is only Winterthur's declarations that establish that both Winterthur America and Winterthur are in the insurance business, but they also establish that they deal in entirely separate lines, and that Winterthur America has no involvement in automobile insurance. On these facts, Winterthur America is no more a "general agent" for Winterthur than Pizza Hut is a general agent for Pepsi. In reality, North is relying on nothing more than the fact of the third-tier subsidiary relationship, which the Ninth Circuit noted in *Wells Fargo* is "irrelevant."

### The Need for Further Discovery

North argues that if the Court does not accept his arguments on the propriety of service and the existence of personal jurisdiction, the Court must allow him discovery and an evidentiary hearing: "[P]revailing Ninth Circuit Court [sic] mandates that the Court set the matter over for an evidentiary hearing on the issues of service and jurisdiction." North 4th Brief, at 4.

 Ninth Circuit authority does not mandate such an evidentiary hearing. Rather, the trial court has broad discretion whether to permit or deny discovery, and its exercise of discretion will be upheld except upon the clear showing that denial of discovery resulted in actual and substantial prejudice to the complaining litigant. *Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 540 (9th Cir.1986). Even if the pleadings and affidavits raise issues of credibility or disputed questions of fact, the trial court still has discretion whether to take evidence at a preliminary hearing in order to resolve the contested issues. *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280 (9th Cir.1977). Although in the absence of an evidentiary hearing the plaintiff need only make a prima facia case, *Data Disc, supra*, this does not require the Court to credit the plaintiff's conclusory allegations. *Pan-*

*da Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001).

 Here, all that North has provided are conclusory allegations. North makes no specific, factual allegations regarding the nature of the business of Winterthur America or the nature of the activities it allegedly conducts on behalf of Winterthur. None of North's bare-bone allegations contradicts the specific factual assertions made by Winterthur and supported by affidavit. Thus except for North's conclusory allegations, there are no material disputed questions of fact nor issues of credibility. Consequently the Court exercises its discretion by determining that no evidentiary hearing is required to resolve the service and jurisdictional issues.

### Existence of Personal Jurisdiction

Although the insufficiency of service of process is itself a sufficient basis to resolve the matter presently pending before this Court—Winterthur's Motion to Set Aside the Default Judgment—the parties have also spent considerable effort briefing the issue of whether personal jurisdiction exists assuming service were adequate. If the Court merely set aside the default based on inadequacy of service, North could presumably correct the service deficiency by serving Winterthur pursuant to the Hague Convention. After further substantial delay, this would merely bring back before the Court the issue of whether personal jurisdiction exists in the Untied States on these facts and thus one or more additional rounds of already duplicative briefing.

Given the adequacy of the record before it, it makes more sense for the Court at this point to address the issue of personal jurisdiction assuming service were proper.

### Forum State vs. National Contacts

■ The first issue is whether to apply Arizona's long arm statute and determine the existence of minimum contacts with Arizona, or whether to apply a national contacts analysis as the Ninth Circuit did in *Go–Video, Inc. v. Akai Elec. Co., Ltd.*, 885 F.2d 1406 (9th Cir.1989), and *Sec. Investor Protection Corp. v. Vigman*, 764 F.2d 1309 (9th Cir.1985).

■ Generally, when there is a "federal statute which permits the service of process beyond the boundaries of the forum state," "the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Vigman*, 764 F.2d at 1315, *quoted in Go–Video*, 885 F.2d at 1414. This "national contacts" test is generally applicable to adversary proceedings in Bankruptcy Court because Bankruptcy Rule 7004(d) permits such nationwide service of process. *See Etalco, Inc. v. AMK Indus., Inc. (In re Etalco, Inc.)*, 273 B.R. 211, 220 (9th Cir. BAP 2001).

Winterthur argues, however, that the national contacts test is not applicable in such a case unless the service was in fact effectuated pursuant to the provision for nationwide service process. In other words, even though a statute may *authorize* nationwide service of process, if the service is actually effected pursuant to some other authority, then the Court must apply the traditional minimum contacts analysis applicable under state law as originally propounded in *Int'l Shoe Co. v. State of Wash.*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Winterthur's argument finds some support in a RICO case, *Doe v. Unocal Corp.*, 27 F.Supp.2d 1174 (C.D.Cal. 1998), aff'd, 248 F.3d 915 (9th Cir.2001). Consequently Winterthur would argue that if service is effected upon Winterthur pursuant to F.R.Civ.P.Rule 4(f), made applicable by F.R.Civ.P.Rule 4(h)(2) and Bank-

ruptcy Rule 7004(a), then such service will not be "pursuant to" the authorization for nationwide service of process contained in Bankruptcy Rule 7004(d), so the national contacts test will be inapplicable.

Whatever the merits of the *Unocal* analysis in RICO cases, it is inapplicable in the bankruptcy context. The statutory provision authorizing nationwide service of process in RICO cases has significant limitations that are not found in the corresponding provision of bankruptcy law. "For nationwide service of process to be imposed under [RICO's nationwide service statute in 18 U.S.C. § 1965(b)], the court must have personal jurisdiction over at least one of the participants in the alleged multidistrict conspiracy and the plaintiff must show that there is no other district in which a court will have personal jurisdiction over all of the alleged co-conspirators." *Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 539 (9th Cir.1986), *quoted in Unocal*, 27 F.Supp.2d at 1182. By contrast, the Bankruptcy Code and Rules impose no such limitation on service or jurisdiction for Bankruptcy adversary proceedings. For prepetition claims, venue of adversary proceedings may lie where the bankruptcy case is pending, 28 U.S.C. § 1409(a), which means there is always personal jurisdiction over corporate defendants in that district by virtue of 28 U.S.C. § 1391(c). *Etalco*, 273 B.R. at 220. There is no additional statutory requirement for the existence of personal jurisdiction over an adversary defendant as there is for RICO cases.

None of the Ninth Circuit authorities approving the national contacts test hinges upon, or even refers to, the manner in which service was actually effected or the specific provision of the rule authorizing such service. Rather, they hold that when Congress has authorized national service, it "broadens the authorized scope of per-

sonal jurisdiction," regardless of "the particular wording of a statute." *Go–Video,* 885 F.2d at 1414.

The contrary rule would create some anomalies. First, it would vary the scope of a court's personal jurisdiction depending on the method utilized to effectuate service. If Congress has given a court the power to reach a particular defendant, the existence of that power should not be made to depend upon the particular method utilized to advise the defendant of the pendency of the action.

Second, and more important, the traditional minimum contacts test was derived primarily out of a concern for principles of federalism. Those principles are inapplicable when Congress has authorized nationwide service of process. Thus someone who has never ventured outside of Rhode Island could be compelled to answer an adversary proceeding in Arizona without any regard to federalism or state boundaries (for example, if an Arizona debtor had a prepetition tort claim against a Rhode Island defendant arising out of a traffic accident while debtor was vacationing in Rhode Island). Yet on Winterthur's argument, if the defendant were a multinational corporation with activities and substantial presence in New York, Florida and California but was served overseas, the court would be compelled to consider the "minimum contacts" with the forum state, even though state boundaries and principles of federalism mean nothing to the foreign defendant, and it is less unfair to compel it to litigate in the forum state than it would be for the Rhode Island resident.

Finally, most if not all the Bankruptcy cases rejecting a national contacts test for foreign defendants did so under a prior version of F.R.Civ.P.Rule 4(e). Under that version, service on foreign defendants could only be made pursuant to a particular federal statute authorizing such service, or else pursuant to state statute or rule. Thus in the absence of a specific federal statute authorizing service, courts were required to apply the applicable state's long arm statute. *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.,* 484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987). Consequently because there was no federal statute specifically authorizing service on foreign defendants for adversary proceedings, some bankruptcy courts concluded they were limited to state long arm statutes, and that the Eleventh Circuit simply erred in its contrary decision in *Nordberg v. Granfinanciera, S.A. (In re Chase & Sanborn Corp.),* 835 F.2d 1341 (11th Cir.1988), *rev'd on other grounds,* 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989). *See, e.g., R.M.R. Corp. v. Clare Bros., Ltd. (In re R.M.R. Corp.),* 133 B.R. 759 (Bankr.D.Md.1991); *Bonapfel v. Cascade Imperial Mills, Ltd. (In re All Am. of Ashburn, Inc.),* 78 B.R. 355 (Bankr. N.D.Ga.1987); *Ross v. Rainbow Travel Agency (In re Crown Hotels (Wash.) Corp.),* 188 B.R. 1 (Bankr.D.C.1995); *Lone Star Indus., Inc. v. Compania Naviera Perez Companc, S.A.C.F.I.M.F.A. (In re New York Trap Rock Corp.),* 155 B.R. 871 (Bankr.S.D.N.Y.1993).

In 1993, however, Rule 4(f) of the Federal Rules of Civil Procedure was substantially amended. As amended, Rule 4(f) "eliminates any requirement that there be explicit authorization by state or federal law for service outside the United States." 4B *Wright & Miller, Federal Practice and Procedure* § 1133, at 309 (3d ed.2002). One express purpose of the change was to overrule *Omni Capital,* which is effectively done in Rule 4(a)(2). *Id.* at 310–11.

The 1993 revisions to F.R.Civ.P.Rule 4 were not incorporated into Bankruptcy Rule 7004 until the 1996 Amendments. Since 1996, however, the Bankruptcy

Rules effectively provide for worldwide service of process, limited only by the due process clause of the Fifth Amendment rather than the Fourteenth Amendment, which "requires only that the defendant have the requisite 'minimum contacts' with the United States," rather than with the forum state. *NationsBank, N.A. v. Macoil, Inc. (In re Med–Atlantic Petroleum Corp.)*, 233 B.R. 644, 653 (Bankr.S.D.N.Y. 1999). Consequently the *Trap Rock* line of cases have themselves become merely "academic." *Levant Line, S.A. v. Marine Enters. Corp. (In re Levant Line, S.A.)*, 166 B.R. 221, 230 n. 14 (Bankr.S.D.N.Y. 1994). Accord, *Anheuser–Busch, Inc. v. Paques, Inc. (In re Paques, Inc.)*, 277 B.R. 615, 629–633 (Bankr.E.D.Pa.2000).

Thus this Court arrives at the same end result as did Bankruptcy Judge Sonderby in *Ace Pecan Co., Inc. v. Granadex Int'l Ltd. (In re Ace Pecan Co., Inc.)*, 143 B.R. 696 (Bankr.N.D.Ill.1992), albeit by a different method. In that case, the court concluded it must apply the state long arm statute, but nevertheless concluded that it could apply a national contacts test even though the state court could not have done so.

For these reasons, this Court concludes that the proper test for personal jurisdiction in all bankruptcy adversary proceedings is the national contacts test, regardless of which subparagraph of Bankruptcy Rule 7004 authorized the particular manner of service that is actually used.

### Insufficient National Contacts

Even with such a broad nationwide contacts test, however, North has not established any sufficient contacts Winterthur has with the United States to establish personal jurisdiction in a bankruptcy case here. The most that has been shown is that it has a subsidiary here, but not that the subsidiary is doing the business of Winterthur. Certainly the fact that Winterthur has a website that is accessible from the United States cannot suffice to establish minimum contacts. *Etalco*, 273 B.R. at 222 n. 7. Consequently this Court must conclude that even if service had been proper, personal jurisdiction could not be asserted over Winterthur given the lack of its minimum contacts with the United States, on this record.

The Court will therefore not only grant Winterthur's Motion to Set Aside the Default, but also its implicit Motion to Dismiss the Complaint for Insufficiency of Process and Lack of Personal Jurisdiction.