**JARROW FORMULAS, INC., Plaintiff,**

v.

**INTERNATIONAL NUTRITION COMPANY, Egbert Schwitters, Norman H. Zivin, and Jack Masquelier, Defendants.**

No. CIV. 3:01CV00478(AVC).

United States District Court, D. Connecticut.

Nov. 16, 2001.

Eric Watt Wiechmann, Alexandra B. Stevens, Cummings & Lockwood, Hartford, CT, for plaintiff.

Richard S. Order, Thomas W. Edgington, Updike, Kelly & Spellacy, P.C., Hartford, CT, for defendants.

### RULING ON THE DEFENDANTS' MOTIONS TO DISMISS

COVELLO, Chief Judge.

This is an action for damages and equitable relief in connection with the marketing and sale of nutritional supplements under certain United States patents. It is brought pursuant to 15 U.S.C. §§ 1 and 2 [1] (the Sherman Antitrust Act), Conn. Gen. Stat. §§ 35–24 to –46 [2] (the Connecticut Antitrust Act), Conn. Gen.Stat. §§ 42–110a to –110q [3] (the Connecticut Unfair Trade Practices Act or CUTPA), 15 U.S.C. § 1125(a) [4] (the Lanham Act), Conn. Gen.

---

1. Section 1 of Title 15 of the United States Code provides, in pertinent part, that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1.

2. "Every contract, combination, or conspiracy in restraint of any part of trade or commerce is unlawful." Conn. Gen.Stat. § 35–26.

3. "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen.Stat. § 42–110b.

4. Section 1125(a)(1) of Title 15 of the United States Code provides that:

[a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion, misrepre-

Stat. § 52–568 [5] (the Connecticut vexatious litigation statute), and common law tenants concerning tortious interference with business relations.

The defendants, Egbert Schwitters and Jack Masquelier, have filed the within motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(2) arguing that the court lacks personal jurisdiction over them. In addition, all the defendants have filed the within motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), arguing that the complaint fails to state a cause of action.

The issues presented are: 1) whether the court can exercise personal jurisdiction over Schwitters and Masquelier; 2) whether the *Noerr–Pennington* [6] immunity doctrine applies to Jarrow's causes of action; 3) whether the complaint alleges sufficient facts to state causes of action under CUTPA, the Lanham Act, the Connecticut vexatious litigation statute, and under common law tenants concerning tortious interference with business relations; and 4) whether the complaint alleges sufficient facts in order to hold the defendant, Norman H. Zivin, liable for each of the asserted causes of action.

For the reasons herein set forth, the motion to dismiss for lack of personal jurisdiction is DENIED as to Masquelier and GRANTED as to Schwitters. The motion to dismiss for failure to state a cause of action is DENIED.

## STANDARD

■ "When a defendant challenges personal jurisdiction in a motion to dismiss, the plaintiff bears the burden of showing through actual proof that the court has jurisdiction over the defendant." *Divicino v. Polaris Indus.*, 129 F.Supp.2d 425, 428 (D.Conn.2001) (citing *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 566–67 (2d Cir.1996)). "Where [ ] there has been no discovery conducted, plaintiff need only assert 'facts constituting a prima facie showing of personal jurisdiction' to defeat a motion to dismiss." *Dan–Dee Int'l, Ltd. v. Kmart Corp.*, No. CIV 99–11689, 2000 WL 1346865, at *2 (S.D.N.Y. Sept.19, 2000) (quoting *PDK Labs Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir.1997)); *see also United States Surgical Corp. v. Imagyn Med. Techs., Inc.*, 25 F.Supp.2d 40, 44 (D.Conn.1998) (noting that the prima facie case of personal jurisdiction over a foreign defendant is established by showing that there is a statutory basis for exercising jurisdiction and that the exercise of jurisdiction over the foreign defendant satisfies due process).

With regard to a motion to dismiss for lack of personal jurisdiction, "[i]n the absence of an evidentiary hearing or a trial on the merits, all pleadings and affidavits are construed in the light most favorable to the plaintiff." *Sherman Assocs. v. Kals,*

sents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such an act. 15 U.S.C. § 1125(a)(1).

**5.** Section 52–568 of the Connecticut General Statutes provides, in pertinent part, that:

[a]ny person who commences and prosecutes any civil action or complaint against another, in his own name or the name of

others, or asserts a defense to any civil action or complaint commenced and prosecuted by another ... (2) without probable cause, and with a malicious intent unjustly to vex and trouble such other person, shall pay him treble damages.

Conn. Gen.Stat. § 52–568.

**6.** *See United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

899 F.Supp. 868, 870 (D.Conn.1995); *see also Beacon Enters., Inc. v. Menzies,* 715 F.2d 757, 768 (2d Cir.1983); *Divicino v. Polaris Indust.,* 129 F.Supp.2d 425, 428 (D.Conn.2001). In addition, "[r]egardless of the controverting evidence put forth by the defendant, the court must resolve all doubts in the plaintiff's favor." *United States Surgical Corp.,* 25 F.Supp.2d at 44 (citing *A.I. Trade Finance, Inc. v. Petra Bank,* 989 F.2d 76, 79–80 (2d Cir.1993)); *see also Divicino,* 129 F.Supp.2d at 428.

"When deciding a motion to dismiss under Rule 12(b)(6), the court is required to accept as true all factual allegations in the complaint and must construe any well pleaded factual allegations in the plaintiff's favor." *Connecticut v. Physicians Health Servs. of CT, Inc.,* 103 F.Supp.2d 495, 500 (D.Conn.2000) (citing *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). "In addition, the court must draw inferences in the light most favorable to the plaintiff." *Id.* "Dismissal is not warranted unless 'it appears beyond doubt that the plaintiff can prove no set of facts in support of the claims which would entitle [it] to relief.'" *Id.* (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The motion must therefore be decided solely on the facts alleged." *Id.* at 501 (citing *Goldman v. Belden,* 754 F.2d 1059, 1065 (2d Cir.1985)).

A compulsory counterclaim is defined as "any claim which at the time of serving the pleading the pleader has against any party if it arises out of the same transaction or occurrence that is the subject of the opposing party's claim." Fed.R.Civ.P. 13(a). "The test for determining whether a counterclaim is compulsory is whether a logical relationship exists between the claim and the counterclaim and whether the essential facts of the claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *Adam v. Jacobs,* 950 F.2d 89, 92 (2d Cir.1991) (quoting *United States v. Aquavella,* 615 F.2d 12, 22 (2d Cir.1979)) (internal quotation marks omitted). "If a party has a compulsory counterclaim and fails to plead it, the claim cannot be raised in a subsequent lawsuit." *Critical–Vac Filtration Corp. v. Minuteman Int'l, Inc.,* 233 F.3d 697, 699 (2d Cir.2000) (citing *Baker v. Gold Seal Liquors, Inc.,* 417 U.S. 467, 469 n. 1, 94 S.Ct. 2504, 41 L.Ed.2d 243 (1974)).

## FACTS

Examination of the complaint discloses the following:

International Nutrition Company ("INC") is a foreign corporation organized under the laws of Liechtenstein with its principal place of business in Liechtenstein. Egbert Schwitters, a citizen of Monaco, "is the founder, sole shareholder, and an officer of INC."

Norman H. Zivin, a resident of New York, "is a member of the state bar of New York, is admitted to practice before the Court of Appeals for the Second Circuit and, is admitted *Pro Hac Vice* before the United States District Court for the District of Connecticut."

Jarrow Formulas, Inc. ("Jarrow") is a corporation organized under the laws of California. Jarrow engages in the sale and distribution of proanthocyanidins for radical scavenging ("PACs") and oligo, or oligomeric, proanthocyanidins ("OPCs") extracted from grape seed.

On April 1, 1985, Masquelier, a citizen of France, executed an assignment of U.S. Patent No. 4,698,360 ("the '360 patent") to Societe Civile d'Investigations Pharmacologiques d'Aquitaine ("SCIPA") and Horphag Research Ltd. ("Horphag"), which was thereafter recorded in the U.S. Patent and Trademark Office. The '360 patent

relates to the use of plant extracts containing proanthocyanidins as a therapeutic agent and as antioxidants.

On April 26 and 29, 1985, SCIPA and Horphag entered into an agreement that would govern their joint ownership of the '360 patent. "The 1985 agreement included a provision that stated that any litigation pertaining to the agreement shall be of the 'exclusive jurisprudency of the Courts of Bordeaux.' "

On March 18, 1994, Masquelier and SCIPA "purported to assign SCIPA's interest in the '360 patent to Defendant INC, ... Horphag's competitor in Connecticut and the United States, without notice to, or consent of, co-owner Horphag."

In October 1995, after learning of the 1994 assignment, Horphag brought suit against INC, SCIPA, and SCIPA's principals, including Masquelier, in France pursuant to the 1985 agreement between Horphag and SCIPA. On March 6, 1996, while the French litigation was pending, INC brought suit in this court against Horphag, Jarrow, and other distributors and customers alleging infringement of the '360 patent and the trademark "OPC–85."

On October 10, 1996, Masquelier assigned to INC "whatever rights, if any, he had in the '360 patent that reverted to him from Horphag." On November 4, 1996, this assignment was recorded in the United States Patent and Trademark Office.

On January 30, 1997, INC filed suit against Horphag, Interhealth Nutritionals, Inc., Natrol, Inc., General Nutrition, Inc., Nat–Trop, and Melaleuca, Inc. in the United States District Court, Northern District of California, alleging infringement of the '360 patent.

"On March 25, 1997, the French trial court declared the 1994 Assignment to INC void ab initio because SCIPA could not assign its interest in the '360 patent to INC without offering Horphag a right of first refusal." On May 28, 1998, the French Appellate Court affirmed the trial court's decision.

On March 18, 2000, this court granted summary judgment for the defendants concluding that: 1) INC's "claim that it was a *bona fide* purchaser for value [wa]s without merit" and 2) "that INC ha[d] no ownership interest in the '360 patent and thus lack[ed] the requisite standing to pursue an action for infringement." INC appealed the order granting summary judgment against INC to the United States Court of Appeals for the Federal Circuit.

INC then filed a motion to amend the complaint and a motion for leave to join Centre d'Experimentation Pycnogenol ("CEP") as a party in connection with the District of Connecticut action. These motions were filed based on CEP's acquisition of SCIPA and INC's subsequent acquisition of CEP. This court denied INC's motions. INC entered a stipulation dismissing with prejudice the trademark infringement count and this court then rendered judgment in favor of all of the defendants, including Jarrow.

On September 5, 2000, the United States District Court for the Northern District of California granted summary judgment against INC.

On February 2, 2001, in connection with another lawsuit by Horphag brought in France, a French court ruled that the exploitation of the '360 patent by INC was fraudulent, that the merger of CEP and SCIPA is annulled for fraud, that INC and CEP are enjoined under penalty of fine from exploiting the '360 patent, and that Horphag may exercise its right of preemption to become the sole owner of the '360 patent.

Jarrow alleges that "[b]y their continuing course of publishing deceptive advertising, falsely claiming sole ownership of U.S. Patent No. 4,698,360 ('the '360 patent'), threatening their competitors with legal action which had no legal or factual basis, and undertaking numerous baseless and vexatious litigation in various venues, the Defendants INC, Schwitters, Masquelier and Zivin have conspired to and undertaken a scheme of anti-competitive conduct in order to monopolize in the United States the sale and distribution of nutritional supplements comprising PACs and covered by the '360 patent (the 'PAC market')."

## DISCUSSION

### I. *Personal Jurisdiction over Schwitters and Masquelier*

The defendants, Schwitters and Masquelier, argue that the court cannot exercise personal jurisdiction over them. Specifically, they argue that there is no personal jurisdiction because neither the Connecticut long-arm statute nor constitutional precepts concerning due process have been satisfied.

Jarrow responds that "in a case in which a foreign defendant is sued under federal law, courts should not look to a state long-arm statute but instead look to the defendant's contacts with the entire United States." Specifically, Jarrow argues that under the aggregate contacts test, the court may exercise personal jurisdiction over Schwitters and Masquelier. In the alternative, Jarrow argues that, even if the court chooses to apply the Connecticut long-arm statute instead of the aggregate contacts test, there is still personal jurisdiction over Schwitters and Masquelier.

■ In considering whether there is personal jurisdiction over a particular defendant, the court may look for guidance to Fed.R.Civ.P. 4(k)(1), which provides, in relevant part, that "[s]ervice of a summons ... is effective to establish jurisdiction over the person of a defendant (A) who could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located, or ... (D) when authorized by a statute of the United States." Jarrow argues that because the Sherman Antitrust Act authorizes worldwide service of process, the court should look to Schwitters and Masquelier's aggregate contacts with the United States to determine whether there is personal jurisdiction.[7] However, this approach to personal jurisdiction is not ap-

---

7. Jarrow cites to 15 U.S.C. § 22, as well as *Cryomedics, Inc. v. Spembly, Ltd.*, 397 F.Supp. 287 (D.Conn.1975), and *Go–Video, Inc. v. Akai Elec. Co.*, 885 F.2d 1406 (9th Cir.1989), in support of its argument.

Section 22 of Title 15 of the United States Code provides that:

[a]ny suit, action, or proceeding under the antitrust laws against any *corporation* may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22 (emphasis added).

In *Go–Video, Inc. v. Akai Electric Co.*, 885 F.2d 1406, 1413–15 (9th Cir.1989), the court addressed whether the district court properly looked to the corporate defendants' national contacts to determine personal jurisdiction in an antitrust action. There, the court held that "the worldwide service provision of § 12 [of the Clayton Act] justifies [the] conclusion that personal jurisdiction may be established in any district, given the existence of sufficient national contacts." *Go–Video, Inc.*, 885 F.2d at 1415. However, *Go–Video* is distinguishable from the issue presented here. In *Go–Video*, the court relied on the federal antitrust act service provision, which applies exclusively to corporations, in adopting the nationwide contacts approach to personal jurisdiction. Here, the court is presented with the issue of whether there is personal jurisdiction over the individual defendants, Schwitters and Mas-

propriate for individual foreign defendants in antitrust actions. In *United Phosphorus, Ltd. v. Angus Chemical Co.,* 43 F.Supp.2d 904, 911 (N.D.Ill.1999), the court recognized a distinction between personal jurisdiction over a foreign corporation and a foreign individual in antitrust actions. The court noted that since "[t]he Clayton Act, 15 U.S.C. § 22, authorizes nationwide service of process on corporations, . . . Rule 4(k)(1)(D) applies [to the corporate defendant.]" *Id.; see also Catrone v. Ogden Suffolk Downs, Inc.,* 647 F.Supp. 850, 855–56 (D.Mass.1986) (noting that 15 U.S.C. § 22 allows for personal jurisdiction over corporate defendants in a Sherman Act cause of action if the corporations have nationwide contacts). "In contrast, either Rule 4(k)(1)(A) or Rule 4(k)(2) is applicable to the individual . . . defendant . . . because he obviously is not a corporation and thus is outside the ambit of 15 U.S.C. § 22." *United Phosphorus, Ltd.,* 43 F.Supp.2d at 911; *see also Catrone,* 647 F.Supp. at 856 ("By its own terms, [15 U.S.C. § 22] is not applicable to individuals."); *California Clippers, Inc. v. United States Soccer Football Assoc.,* 314 F.Supp. 1057, 1065 (N.D.Cal.1970) (noting that "the service of process provision of Clayton Act § 12 is inapplicable, since it is directed only at corporations, not individuals"). In *Catrone v. Ogden Suffolk Downs, Inc.,* the court noted that "[a]s to the individual defendants, the federal statutes under which plaintiff is suing apparently contain no other service or personal jurisdiction provisions. Consequently, we look to Rule 4's service of process provisions, which in turn directs us to [the state's] long arm statute." 647 F.Supp. 850, 856 (D.Mass.1986). Accordingly, the court will look to the Connecticut long arm statute, Conn. Gen.Stat. § 52–59b, to determine whether there is personal jurisdiction over the Schwitters and Masquelier.[8]

The Connecticut long arm statute provides, in relevant part, that:

[a]s to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident individual . . . who in person or through an agent: (1) Transacts any business within the state; (2) commits a tortious act within the state . . .; (3) commits a tortious act outside the state causing injury to person or property within the state . . . if such person or agent (A) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (B) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; (4) owns, uses or possesses any real property situated within the state; or (5) uses a computer . . . or a computer network . . . located within the state.

Conn. Gen.Stat. § 52–59b(a).

Jarrow argues that there is personal jurisdiction over Schwitters and Masqueli-

quelier. Therefore, 15 U.S.C. § 22 and the nationwide contacts approach do not apply.

Jarrow's reliance on *Cryomedics, Inc. v. Spembly, Ltd.,* 397 F.Supp. 287 (D.Conn. 1975), is misplaced. There, the issue presented was whether the application of the Connecticut corporate long-arm statute, Conn. Gen.Stat. § 33–411(c), to a corporation incorporated in Great Britain was unconstitutional. *Cryomedics, Inc. v. Spembly,* 397 F.Supp. 287, 287–88 (D.Conn.1975). Here, the issue is what test should be applied to determine whether the court can exercise personal jurisdiction over individual foreign defendants, not whether the test selected is unconstitutional as applied to the defendants.

8. Because Jarrow does not argue that Fed. R.Civ.P. 4(k)(2) provides for personal jurisdiction over Schwitters and Masquelier, the court will not address this matter.

er based upon their transaction of business in Connecticut, their commission of a tortious act in Connecticut, or their commission of a tortious act outside the state causing injury to person or property within the state.

As to the transaction of business argument, Jarrow argues that:

> [c]ertainly defendants have transacted business in Connecticut with the sole United States distributor for Masquelier's Original OPCs ... [and that] Defendants cannot just utilize INC to bring a baseless lawsuit in Connecticut and employ a Connecticut distributor to dispense their products and their propaganda throughout the United States, and then claim that they cannot be hauled into court here.

In addition, the verified complaint alleges that "Defendants INC, Schwitters, and Masquelier manufacture, sell, and distribute nutritional supplements including proanthocyanidins for radical scavenging ('PACs')," that "Defendants INC, Schwitters, Masquelier, and Zivin have and were engaged in trade or commerce in the State of Connecticut ... [and that] INC, Schwitters, and Masquelier compete against Jarrow in the sale and distribution of PACs throughout the State of Connecticut." Complaint ¶¶ 5, 47.

■ "[T]he term 'transacts any business' ... embrace[s] a single business transaction." *Zartolas v. Nisenfeld*, 184 Conn. 471, 440 A.2d 179, 181 (1981). "In determining whether the plaintiffs' cause of action arose from the defendants' transaction of business within the state we do not resort to a rigid formula. Rather, we balance considerations of public policy, common sense, and the chronology and geography of the relevant factors." *Zartolas v. Nisenfeld*, 184 Conn. 471, 440 A.2d 179, 182 (1981).

■ As to Masquelier, keeping in mind that, "[i]n the absence of an evidentiary hearing or a trial on the merits, all pleadings and affidavits are construed in the light most favorable to the plaintiff," *Sherman Assocs. v. Kals*, 899 F.Supp. 868, 870 (D.Conn.1995), the court concludes that the factual allegations in the complaint are sufficient to make a prima facie showing that Masquelier transacts business in Connecticut. Jarrow's lawsuit arises from, among other things, the alleged sales and distribution of products in Connecticut by Masquelier along with the other defendants.

■ Satisfaction of the long arm statute alone, however, is not enough to establish personal jurisdiction over Masquelier. "In ... federal question lawsuits, before a federal court can properly assert personal jurisdiction over such defendants, it must make two inquiries. First, it must determine whether the state's long-arm statute authorizes the exercise of jurisdiction. Second, the court must decide whether the statutory authority comports with due process." *Greene v. Sha–Na–Na*, 637 F.Supp. 591, 594–95 (D.Conn.1986) (citations omitted). "The due process test for personal jurisdiction has two related components: the 'minimum contacts' inquiry and the 'reasonableness' inquiry." *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 567 (2d Cir.1996). "To have these minimum contacts, a defendant must purposely avail himself of the privileges and immunities of the forum state." *United States Surgical Corp. v. Imagyn Medical Technologies, Inc.*, 25 F.Supp.2d 40, 44–45 (D.Conn.1998) (citing *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)).

> The second stage of the due process inquiry asks whether the assertion of personal jurisdiction comports with "traditional notions of fair play and substan-

tial justice"—that is, whether it is reasonable under the circumstances of the particular case. The Supreme Court has held that the court must evaluate the following factors as part of this "reasonableness" analysis: (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*Metropolitan Life Ins. Co.*, 84 F.3d at 568 (citations omitted).

The court concludes that the due process prong of the personal jurisdiction analysis is also satisfied as to Masquelier. Based upon the allegations set forth in the complaint, it is clear that Masquelier has the minimum contacts necessary for the court to assert jurisdiction over him. The complaint further alleges that Masquelier has participated in the manufacture, sale, and distribution of products in the state of Connecticut. By doing so, he has purposefully availed himself of this forum. Also, the exercise of personal jurisdiction over Masquelier is reasonable. Since Masquelier has chosen to transact business in Connecticut, it is not unreasonable to require him to defend himself in Connecticut in a lawsuit related to that business. In addition, Jarrow has a strong interest in obtaining relief against all the defendants in one action and allowing for personal jurisdiction over Masquelier will assist in "obtaining the most efficient resolution of the controversy."

For the foregoing reasons, the court concludes that Jarrow has satisfied its burden of making a prima facie case of personal jurisdiction over Masquelier. It

should be noted, however, that "[e]ventually ... Plaintiff must prove the jurisdictional facts by a preponderance of the evidence at either an evidentiary hearing or trial." *Gerber Trade Finance, Inc. v. Davis, Sita & Co., P.A.*, 128 F.Supp.2d 86, 90 (D.Conn.2001) (citing *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 154 (2d Cir.1999)).

■ As to Schwitters, Jarrow has not made out a prima facie case under the transaction of business provision of the long arm statute. "Courts in this district have held that personal jurisdiction over a director or officer must be based on conduct apart from acts in the director or officer's official capacity." *Reese v. Arrow Fin. Servs., LLC*, 202 F.R.D. 83, 89 (D.Conn.2001); *see also Bross Utils. Serv. Corp. v. Aboubshait*, 489 F.Supp. 1366, 1373–74 (D.Conn.) (holding that, in connection to the transaction of business provision of the Connecticut long arm statute, there was no personal jurisdiction when "[n]othing in the record indicates that the individual defendants transacted any business other than through the corporations which they controlled"), *aff'd*, 646 F.2d 559 (2d Cir.1980); *Hagar v. Zaidman*, 797 F.Supp. 132 (D.Conn.1992). The complaint has not sufficiently set forth that the transaction of business allegedly performed by Schwitters in Connecticut was performed other than through INC. Therefore, the transaction of business prong of the Connecticut long arm statute does not apply to Schwitters.

Jarrow also argues that Schwitters was "directly involved in tortious activities that either took place in Connecticut or had an injurious effect in Connecticut" and that he was "involved in bringing a baseless litigation in the state and in misrepresenting that litigation and other litigations in Connecticut and throughout the United States."

Jarrow argues that because Schwitters allegedly was actively involved in INC's filing of the prior patent litigation in Connecticut, he committed a tortious act within the state. Even if Schwitters was involved in the decision to file the patent litigation, this would still not be a tortious act committed in Connecticut. INC was the only party that filed the patent infringement suit and therefore, INC is the only party that committed a tortious act, if any, in Connecticut. Also, the complaint does not specifically allege facts to show that Schwitters misrepresented the litigation in Connecticut. The only allegations as to the misrepresentations are too vague to make even a prima facie showing of a tortious act in Connecticut.[9]

Jarrow finally argues that Schwitters has committed a tortious act outside the state causing injury in Connecticut. Under this provision of the Connecticut long arm statute, Jarrow must show that: 1) Schwitters committed a tortious act outside Connecticut; 2) that act cause injury to person or property within Connecticut; and either that Schwitters or his agent 3) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in Connecticut; or 4) expects or should reasonably expect the act to have consequences in Connecticut and derives substantial revenue from interstate or international commerce. *See* Conn. Gen. Stat. § 52–59b. The complaint fails to al-lege facts that make out a prima facie case under this provision of the long arm statute. Even assuming *arguendo* that Schwitters committed a tortious act outside Connecticut, the complaint does not sufficiently allege that Jarrow's injury occurred in Connecticut. *See Harris v. Wells,* 832 F.Supp. 31, 35 (D.Conn.1993) ("The crucial factor is whether the plaintiff suffered direct economic injury within Connecticut."); *Bross Utils. Serv. Corp. v. Aboubshait,* 489 F.Supp. 1366, 1374–75 (D.Conn.) (noting that, under Conn. Gen. Stat. § 52–59b(a)(3), "the place of injury is generally 'the place where the critical events associated with the dispute took place' "), *aff'd,* 646 F.2d 559 (2d Cir.1980). In addition, even if the complaint's allegations were sufficient to establish injury in Connecticut, the complaint does not sufficiently allege either that third or fourth factors of this provision have been satisfied. *See Hagar v. Zaidman,* 797 F.Supp. 132, 137 (D.Conn.1992). Accordingly, Jarrow has not made a prima facie showing that the court has personal jurisdiction over Schwitters.

## II. *Failure to State a Cause of Action*

### A. *Compulsory Counterclaims*

The defendants first argue that Jarrow's causes of action are barred because they are compulsory counterclaims that should have been raised during the prior patent infringement litigation.[10] Specifically, the defendants argue that

---

**9.** Most of Jarrow's factual allegations as to Schwitters' misrepresentations are too generalized. For example, in paragraph 10 of the declaration of Jarrow L. Rogovin, Jarrow's president, he states that "Schwitters ... has actively participated in ... marketing [the] litigations [concerning the '360 patent] to the public." Also, paragraph 17 of the verified complaint alleges that "Schwitters ... publicize[d] INC's false claim to ownership of the '360 patent." Neither of these allegations indicates where these acts took place. Furthermore, when Jarrow specifically alleges where Schwitters made misrepresentations, the locations are not in Connecticut. *See* Rogovin Decl. ¶ 11 (discussing Schwitters' appearances at two trade shows in California).

**10.** As the defendants noted, this argument does not apply to Jarrow's vexatious litigation claim.

"Jarrow's claims in this suit were compulsory counterclaims in the prior suit because the claims Jarrow has asserted here are logically connected to the claims in the prior case."

Jarrow responds that it "never had an opportunity to assert the antitrust counterclaim," that "many of the facts giving rise to the antitrust and related claims arose after the filing of the patent infringement suit," and that "[t]he antitrust and related claims at issue in this case involve numerous factual issues distinct from those involved in the underlying patent infringement litigation."

Federal Rule of Civil Procedure 13(a) states that "[a] pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." In *Critical–Vac Filtration Corp. v. Minuteman Int'l, Inc.*, 233 F.3d 697 (2d Cir.2000), the court addressed the issue of whether an antitrust action was barred because the plaintiff failed to raise it as a compulsory counterclaim in a previous patent infringement action. There, the defendant, Minuteman, had previously brought suit against the plaintiff, Critical–Vac, for patent infringement. *See Critical–Vac Filtration Corp. v. Minuteman Int'l, Inc.*, 233 F.3d 697, 698 (2d Cir.2000). Critical–Vac was successful in defeating that action by showing that the defendant improperly obtained a broader reissue patent from the United States Patent and Trademark Office. *See id.* at 698–99. Thereafter, Critical–Vac brought suit against Minuteman alleging that Minuteman "engaged in acts of monopolization" in violation of federal and state antitrust law by committing a fraud on the patent office, trying to enforce an invalid patent, and engaging in a sham litigation against Critical–Vac and other companies in connection with the broader reissue patent. *Id.* at 699. Since Critical–Vac's antitrust action was based on the same facts that resulted in its success in the patent infringement action, the court held that it was barred based on the compulsory counterclaim rule. *See id.* at 700–701. In its analysis, the court emphasized that, in connection with its antitrust action, Critical–Vac did not "allege[ ] any facts that arose after the filing of its answer in the [prior patent infringement] litigation." *Id.* at 700.

In contrast to *Critical–Vac*, here, the complaint does allege, as part of its antitrust action, facts that arose after the filing of its motion to dismiss and related motion for summary judgment in the prior patent litigation. In addition, Jarrow's antitrust action is not based solely on the same defenses it raised in its successful motion for summary judgment in the prior litigation.

The court in *Critical–Vac Filtration Corp. v. Minuteman Int'l, Inc.*, 233 F.3d 697 (2d Cir.2000) also discussed the difference between patent misuse and patent invalidity cases in connection with compulsory counterclaims. *Critical–Vac* dealt with a patent invalidity issue. The court noted that antitrust cases based on patent invalidity "will generally involve the same factual issues as those involved in the patent infringement litigation between the same parties." *Critical–Vac Filtration Corp.*, 233 F.3d at 703. In contrast, "[a]ntitrust claims based on patent misuse . . . are likely to involve factual issues distinct from those involved in the patent infringement litigation between the same parties." *Id.* It should be noted that the court did recognize that not all antitrust causes of action dealing with patent misuse can be raised in a separate suit, but that a court must evaluate the facts of the antitrust cause of action to determine if the action is

so logically connected with a patent infringement cause of action that it is considered a compulsory counterclaim. *See id.* at 704 n. 9. In this case, the prior infringement cause of action dealt with patent misuse based on an improper claim of patent ownership, unlike the circumstances in *Critical–Vac.*

The court concludes that Jarrow's antitrust action involves factual issues distinct from those involved in the prior patent infringement litigation, including: whether the defendants knew INC did not own the '360 patent when it brought the patent infringement suit; whether the defendants knew INC did not own the patent after commencing suit, but still continued to pursue the suit; whether the defendants issued false and misleading press releases related to ownership of the '360 patent, the ongoing patent infringement litigation, and the litigation in France; and whether the defendants threatened competitors and customers in order to create a monopoly in the relevant market. Accordingly, the court concludes that Jarrow's antitrust causes of action are not compulsory counterclaims within the meaning of Fed. R.Civ.P. 13(a).

### B. *Noerr–Pennington Immunity*

The defendants next argue that Jarrow's federal and state antitrust causes of action, as well as its CUTPA, vexatious litigation, and tortious interference with business relationships causes of action, should be dismissed because the pursuit of these causes of action is barred by the *Noerr–Pennington* immunity doctrine.[11] The *Noerr–Pennington* doctrine provides immunity from antitrust liability to those who petition the government for redress, so long as the activities undertaken are not considered sham activities. *See Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 56–57, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) (discussing the evolution of the *Noerr–Pennington* doctrine, the doctrine's application to judicial proceedings, and defining the "sham litigation" exception to *Noerr–Pennington* immunity).

Jarrow responds that it has alleged facts in its complaint that are sufficient to show that the defendants' prior patent litigation was a sham litigation and therefore, the defendants are not entitled to immunity from the antitrust and related causes of action.

"Those who petition government for redress are generally immune from antitrust liability." *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 56, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993). In *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 136, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), the Supreme Court held that "the Sherman Act does not prohibit … persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly." In *United Mine Workers of America v. Pennington,* 381 U.S. 657, 670, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the Court stated that "*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." In *Noerr,* the Court established an exception to immunity from antitrust liability for "sham" activities. *See Noerr,* 365 U.S. at 144, 81 S.Ct. 523. This exception was meant to address situations where the activity, "ostensibly

---

**11.** *See United Mine Workers of Am. v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *E. R.R. Presidents Conference v.* *Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

directed toward influencing governmental action, [was] a mere sham to cover ... an attempt to interfere directly with the business relationships of a competitor." *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). In *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), the Supreme Court held that this immunity doctrine applies to court proceedings.

In *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993), the Court explained how the "sham" exception applies to court proceedings. In doing so, the Court "outline[d] a two-part definition of 'sham' litigation." *Id.*

First, the lawsuit much be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals "an attempt to interfere directly with the business relationships of a competitor through the use [of] the government *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon."

*Id.* at 60–61, 113 S.Ct. 1920 (citations omitted).

The Court noted that "a court must 'resist the understandable temptation to engage in *post hoc* reasoning by concluding' that an ultimately unsuccessful 'action must have been unreasonable or without foundation.'" *Id.* at 61, 113 S.Ct. 1920 (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421–22, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978)).[12]

In *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 53, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993), the Court applied its definition of "sham" litigation in the context of a summary judgment motion. There, the plaintiff "failed to establish the objective prong of Noerr's sham exception." *Id.* at 65, 113 S.Ct. 1920. Since the motion to dismiss standard is much lower than the summary judgment motion standard, the application of this two-part definition in this case will vary from the Court's application in *Professional Real Estate Investors*. Here, all that is required is that the complaint allege facts, which, if proven, show that the defendant is not entitled to *Noerr–Pennington* immu-

**12.** The defendants argue that the *Noerr–Pennington* doctrine should be applied to Jarrow's state and common law causes of action. The court agrees. In *Suburban Restoration Co. v. ACMAT Corp.*, 700 F.2d 98, 102 (2d Cir.1983), the court stated that "[e]specially since *Noerr–Pennington's* statutory exemption is defined in terms of first amendment activity, we are confident that Connecticut's courts would carve out a similar exception to CUTPA and the common law, whether or not they believed that they were required to do so by the Consti-tution." Although the Connecticut Supreme Court has yet to address this issue, the Connecticut appellate court recently held that "[s]eventeen years later, we fulfill the Second Circuit's prophecy and adopt the Noerr–Pennington doctrine and its accompanying sham exception as the applicable analysis for cases such as this one [*i.e.*, cases alleging vexatious litigation and tortious interference with business relationships.]" *Zeller v. Consolini*, 59 Conn.App. 545, 758 A.2d 376, 382 (2000).

nity under the sham litigation exception. *See Moore U.S.A., Inc. v. Standard Register Co.*, 139 F.Supp.2d 348, 358–59 (W.D.N.Y.2001) (concluding that the defendant's antitrust counterclaims would not be dismissed because the defendant "made numerous allegations that could support a finding that [the plaintiff,] and its alleged co-conspirators, have engaged in and are engaging in sham litigation through the present lawsuit" and "reject[ing] [the plaintiff's] attempt to interject evidence and arguments of fact into this Rule 12(b)(6) motion"); *Hartford Life Ins. Co. v. Variable Annuity Life Ins. Co., Inc.*, 964 F.Supp. 624, 628 (D.Conn.1997) (concluding that, even if the allegations in the defendant's counterclaim are correct, the counterclaim alone still "does not [establish] that there was no probable cause to initiate the lawsuit at the outset"); *Skinder-Strauss Assocs. v. Mass. Continuing Legal Educ., Inc.*, 870 F.Supp. 8, 10 (D.Mass.1994) ("Because [the defendant's] counterclaims allege that the lawsuit filed by [the plaintiff] is objectively baseless and conceals an attempt to interfere directly with the business relationships of a competitor, the counterclaims adequately state a claim and should not be dismissed under Fed.R.Civ.P. 12(b)(6).").

The complaint alleged facts, which, if proven, would satisfy the two-part definition of sham litigation.[13] The complaint alleges that the defendants' prior litigation was objectively baseless and that the litigation "conceal[ed] 'an attempt to interfere directly with the business relationships of a competitor.'" *See* Complaint ¶¶ 9, 15, 16 (alleging that the prior litigation was "baseless," asserted false claims, including that "INC was the owner of the '360 pat-

ent," was brought even though the Defendants "knew or reasonably should have known that INC did not have a good faith basis to claim ownership of the '360 patent," and was initiated as part of "a scheme of anti-competitive conduct in [an attempt] to monopolize in the United States the sale and distribution of nutritional supplements comprising PACs and covered by the '360 patent"). Therefore, the complaint has alleged sufficient facts, which, if proven, show that the defendants are not entitled to immunity under the *Noerr–Pennington* doctrine.

### C. CUTPA

The defendants next argue that "[r]egardless of whether the *Noerr–Pennington* doctrine is determined to bar Jarrow's state statutory and common law claims, . . . Jarrow has failed to state a claim under CUTPA upon which relief can be granted." Specifically, the defendants argue that because the "'filing of a single non-sham lawsuit cannot form the basis of a claim under CUTPA,'" Jarrow's CUTPA cause of action should be dismissed.

Jarrow responds that it has "properly alleged that Defendants' Connecticut patent infringement suit was a sham and therefore Defendants are not entitled to *Noerr–Pennington* immunity." In addition, Jarrow also states that its "CUTPA claim goes beyond simply alleging that the filing of only one sham lawsuit violated CUTPA."

In *Suburban Restoration Co. v. ACMAT Corp.*, 700 F.2d 98, 102 (2d Cir.1983), the court held that "the activity complained of . . .—the filing of a single non-sham law-

---

**13.** As noted earlier, in addition to alleging that the defendants' lawsuit was a sham litigation, the complaint alleges other facts in support of the causes of action for federal and state antitrust violations, as well as Connecticut statutory and common law causes of action. Therefore, even if the court dismissed the allegations related to the prior litigation, the complaint would still state federal and state causes of action.

suit—cannot form the basis of a claim under CUTPA." There, the district court had found that the activity complained of did not fall within the sham exception to the Noerr–Pennington doctrine. *See id.* at 99–100. Here, on the other hand, the court concludes that the complaint alleges facts, which, if proven, satisfy the sham exception.

"Connecticut courts, when determining whether a practice violates CUTPA, will consider (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen) . . . . "

*Ancona v. Manafort Bros., Inc.,* 56 Conn. App. 701, 746 A.2d 184, 193 (2000) (quoting *Prishwalko v. Bob Thomas Ford, Inc.,* 33 Conn.App. 575, 636 A.2d 1383 (1994)).

The complaint alleges facts that support its CUTPA cause of action in addition to the filing of a sham litigation. The complaint alleges that the defendants "deceptively record[ed] the purported 1996 Assignment in the United States Patent & Trademark Office," that the defendants "continued to conspire and pursue and publicize INC's false claim to ownership of the '360 patent," that the defendants "have conspired to and continued to . . . make threats and other false statements concerning alleged infringement of the ['360] patent in publications to customers, potential customers, and the trade," and that "[a]s a direct and proximate result of the Defendant's actions and conduct, Jarrow has suffered and continues to suffer an economic loss." Complaint ¶¶ 20, 23, 33, 50. Based on these facts, as alleged in the complaint, the court concludes that the complaint states a cause of action under CUTPA. Therefore, the motion to dismiss the CUTPA cause of action is denied.

### D. *Lanham Cause of Action*

The defendants next argue that the complaint has fails to state a cause of action under the Lanham Trademark Act. Specifically, the defendants argue that Jarrow's "Lanham Act claim, as alleged, including all the facts set forth in the complaint and adopted by reference, do no state a claim."

Jarrow responds that "the allegations of [its] verified complaint state that Defendants made numerous false and misleading statements of fact and disparaged [its] commercial activities."

"In order to plead a claim for relief under the [Lanham Act 15 U.S.C. § 1125], plaintiffs must allege that defendants (1) made false or misleading representations (2) for goods, (3) in interstate commerce, (4) in commercial advertising or promotion, (5) about a material facet of plaintiffs' product, (6) that caused damage to plaintiffs." *Conmed Corp. v. ERBE Electromedizin GmbH,* 129 F.Supp.2d 461, 470 (N.D.N.Y.2001). The complaint alleges that

[i]n connection with products covered by the '360 patent, Defendants . . . have used in commerce false or misleading descriptions of fact and false or misleading representations of fact which have caused and continue to cause confusion, deception, and mistake among consumers as to the rightful owner of the '360 patent and Jarrow's right to sell OPC's without being subjected to suit by the

Defendants, and have disparaged Jarrow's commercial activities.

Complaint ¶ 54.

The complaint also alleges facts in support of these allegations. *See* Complaint ¶¶ 9, 17, 18, 23, 27, 33, 38. The court concludes that the complaint states a cause of action for relief under the Lanham Act by alleging that the defendants published advertising that included false or misleading representations regarding Jarrow's right to sell its OPC products and the ownership of the '360 patent, thereby undermining Jarrow's interstate commercial activity and resulting in economic injury to Jarrow's business.

### E. *Vexatious Litigation*

The defendants next argue that Jarrow's vexatious litigation claim "fails to allege the essential elements of vexatious litigation." Specifically, the defendants argue that the complaint fails to allege three of the four required elements of a cause of action for vexatious litigation.

Jarrow responds that "[c]ontrary to Defendants' arguments, Jarrow has clearly stated a claim for vexatious litigation."

■ The Connecticut vexatious litigation statute provides in relevant part that "[a]ny person who commences and prosecutes any civil action against another in his own name or in the name of others ... without probable cause, and with malicious intent unjustly to vex and trouble such persons shall pay him treble damages." Conn. Gen.Stat. § 52–568. "The elements of vexatious litigation [are]: (1) [the defendant] initiated or procured the institution of proceedings against the plaintiff, (2) the proceedings terminated in favor of the plaintiff, (3) the defendant acted without probable cause, and (4) the defendant acted with malice." *Fink v. Magner,* 988 F.Supp. 70, 72 (D.Conn.1997) (citing

*McHale v. W.B.S. Corp.,* 187 Conn. 444, 446 A.2d 815, 817 (1982)).

■ The defendants do not dispute that the complaint properly asserts facts to establish the first element of the cause of action. As to the second element, however, the defendants argue that because "the prior case was decided on procedural grounds, ... there was no disposition in Jarrow's favor on the merits." However, as the court in *DeLaurentis v. City of New Haven,* 220 Conn. 225, 597 A.2d 807, 820 (1991), noted, "we have never required a plaintiff in a vexatious suit action to prove a favorable termination either by pointing to an adjudication on the merits in his favor or by showing affirmatively that the circumstances of the termination indicated his ... nonliability, so long as the proceeding has terminated without consideration." Since Jarrow's summary judgment motion was granted in the prior patent litigation in the district court and the district court's decision was affirmed on appeal by the Court of Appeals, Federal Circuit, the defendants' argument is without merit.

■ As to the third element of the cause of action, the defendants argue that "Jarrow also can allege no facts to allege that INC's lawsuit was filed without probable cause." "[I]n the context of a vexatious suit action, the defendant lacks probable cause if he lacks a reasonable, good faith belief in the facts alleged and the validity of the claim asserted." *DeLaurentis v. City of New Haven,* 220 Conn. 225, 597 A.2d 807, 823 (1991). Here, the complaint alleges that "[a]t the time of filing the Connecticut lawsuit, [the defendants] knew or reasonably should have known that INC did not have a good faith basis to claim ownership of the '360 patent, and that INC did not have a good faith basis to assert that Jarrow was infringing the purported trademark 'OPC–85.'" Complaint

¶ 16. These allegations are sufficient to survive a motion to dismiss.

 As to the fourth element, the defendants argue that "Jarrow has not alleged that INC acted with malice in filing the Connecticut action." "The want of probable cause ... cannot be inferred from the fact that malice was proven;" however, "[m]alice may be inferred from lack of probable cause." *Vandersluis v. Weil,* 176 Conn. 353, 407 A.2d 982, 985 (1978). Since the court concludes that the complaint has sufficiently alleged a lack of probable cause and also has alleged that the defendants brought the prior litigation "with a malicious intent unjustly to vex and trouble Jarrow," the court concludes that the fourth element of the cause of action for vexatious litigation has been properly alleged.

F. *Tortious Interference with Advantageous Business Relations*

The defendants finally argue that Jarrow's tortious interference with advantageous business relations cause of action should be dismissed because the "[c]omplaint contains no specific allegations of fraud, misrepresentation, intimidation, molestation or malicious activity by INC."

Jarrow responds that it "properly pled that Defendants tortiously interfered with advantageous business relations in that it alleged facts demonstrating that Defendants acted fraudulently and maliciously and made many misrepresentations to the public and various courts."

 In order to establish a cause of action for tortious interference with business relations, "[a] plaintiff must prove that the defendant's conduct was in fact tortious, by showing that the defendant was, for example, guilty of fraud, misrepresentation, intimidation, molestation, or that the defendant acted maliciously." *Couldock & Bohan, Inc. v. Societe Generale Securities Corp.,* 93 F.Supp.2d 220,

235 (D.Conn.2000) (citing *Blake v. Levy,* 191 Conn. 257, 464 A.2d 52, 54 (1983)). In the context of a motion to dismiss, the plaintiff need only "sufficiently plead each element of this claim." *Subsolutions, Inc. v. Doctor's Assocs., Inc.,* 62 F.Supp.2d 616, 628 (D.Conn.1999). Here, the complaint includes allegations that the defendants made false statements and misrepresentations, which is all that is required to defeat a motion to dismiss. Therefore, the defendants' motion to dismiss Jarrow's tortious interference cause of action is denied.

G. *Defendant Zivin*

 Zivin argues for the first time in the defendants' reply memorandum that "[a]ll claims against [him] fail to state a claim for relief" because "Plaintiff states no facts which implicate [him] in any unlawful conduct [and] ... [Zivin] is accused in the Complaint only of filing lawsuits on INC's behalf and recording patent assignments in the PTO on INC's behalf."

Jarrow responds that since "Jarrow's Verified Complaint includes numerous allegations of actions taken by Zivin which exceeded his role as legal advisor, ... [it] has alleged sufficient facts to state a claim against Zivin."

Based on the facts alleged in the complaint, Zivin's argument lacks merit. The complaint alleges that Zivin participated in most of the actions that resulted in the current litigation. For example, the complaint alleges that Zivin participated in the conspiracy by "undertaking numerous baseless and vexatious litigation in various venues" and that Zivin "induced INC, Schwitters, and Masquelier to deceptively enter into the 1996 Assignment, which he then caused to be recorded with the United States Patent & Trademark Office." Complaint ¶¶ 9, 21. In addition, the complaint alleges that

by becoming involved in the business affairs of INC, Schwitters, and Masque-

lier, including formulating strategy in connection with the scheme to monopolize the PAC market, conspiring with one or more of the other Defendants to create, and becoming an active participant in and formulating policy decisions in connection with, a continuing course of conduct as described in this Court to monopolize and/or unfairly restrain trade of supplements covered by the '360 patent throughout the United States, Zivin exceeded his role as legal advisor.

Complaint ¶ 36.

Therefore, the motion to dismiss is denied.

### CONCLUSION

For the reasons stated above, the defendants motion to dismiss for lack of personal jurisdiction (document no. 10) is **DENIED** as to Masquelier and **GRANTED** as to Schwitters, and the defendants' motion to dismiss for failure to state a claim (document no. 12) is **DENIED**.

IT IS SO ORDERED, this day of November, 2001, at Hartford, Connecticut.